UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ASPEN AMERICAN INSURANCE CO., | ) | |
| as subrogee of Eastern Fish Company, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:14-CV-383-WCL-SLC |
| | ) | |
| v. | ) | |
| | ) | |
| INTERSTATE WAREHOUSING, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT
TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

NOW COMES the plaintiff, ASPEN AMERICAN INSURANCE CO., as subrogee of Eastern Fish Company ("Aspen"), and submits this memorandum in support of its motion for partial summary judgment against defendant, Interstate Warehousing, Inc. ("Interstate").

**I.      Introduction.**

This is an action for damages resulting from the loss of food products owned by Eastern Fish Company ("Eastern Fish") while stored in Interstate's cold-storage warehouse in Hudsonville, Michigan. Aspen insured the food products for Eastern Fish and paid Eastern Fish's claim in return for subrogation rights.

At all material times, Eastern Fish was engaged in the sourcing and selling of frozen seafood products to grocery stores (such as Meijer), who then ultimately sold the seafood to consumers within the United States. At all material times, Interstate owned and operated cold-storage warehouses throughout the United States. As part of their services, Interstate tracked inventory and warehoused frozen food products for a variety of customers, including Eastern Fish.

Defendant Interstate owned and operated a warehouse in Hudsonville, Michigan (hereinafter the "Warehouse"). Eastern Fish contracted with Interstate for storage of temperature-sensitive food products, and related services, at the Warehouse. In March of 2014, Interstate had possession of over $2.4 million of food products belonging to Eastern Fish within the Warehouse (the "Food Products").

In mid-February of 2014, Interstate's management grew concerned with the snow and ice accumulation on the roof of the Warehouse. The Warehouse staff had no education or training related to snow management, structural engineering or the tolerance of the Warehouse roof to snow loads. No one at Interstate's corporate office had drawings or information regarding the design specifications of the Warehouse to determine how much weight the roof could hold. Though Interstate had an estimated weight of the snow, an estimated weight that exceeded the design specifications, Interstate never used that information to take action when faced with substantial risk of a roof collapse. In addition, Interstate never provided the information to people with education and experience that could evaluate the risk of roof collapse or advise regarding preventative measures. Interstate violated industry standards with respect to the snow and ice accumulation and did nothing to protect millions of dollars' worth of customer products within the Warehouse.

On March 8, 2014, part of the roof of the Warehouse collapsed (the "Roof Collapse"). The Roof Collapse caused an anhydrous ammonia leak in the area where Interstate stored the Food Products. Further, the Roof Collapse rendered the refrigeration system of the Warehouse inoperable, subjecting the temperature-sensitive products within the Warehouse to temperature damage. Following the Roof Collapse, Interstate restricted customers from accessing their products and the structure, but allowed their own investigators to examine the structural failure.

The Michigan Department of Agriculture seized the Food Products from Interstate. Weeks later, Interstate hired a contractor to haul the Food Products away and have them disposed so that Interstate could satisfy its own obligations to the government related to the seizure of the Food Products.

Aspen is the subrogated underwriter of the Food Products and paid Eastern Fish for the loss in return for subrogation rights. Aspen seeks partial summary judgment on its claims involving breach of bailment, conversion and gross negligence.

## II.      Jurisdiction.

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff, Aspen, is a Texas corporation with its principal place of business located in Rocky Hill, Connecticut. Defendant, Interstate, is an Indiana corporation with a principal place of business in Fort Wayne, Indiana. Plaintiff's claim exceeds the jurisdictional amount.

## III.      Summary judgment standard.

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); *Unterreiner v. Volkswagon of America, Inc.*, 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P 56(e); *Becker v. Tenenbaum-Hill Association, Inc.*, 914 F.2d 107, 110 (7th Cir. 1990). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving

party].” *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

### IV.      Statement of material facts.

At all material times, Interstate provided warehousing services for hire. *Exhibit 1, Defendant's Response to Plaintiff's Requests for Admission, ¶ 3*. Interstate entered into a contract with Eastern Fish for storage of food products (the "Warehouse Contract"). *Exhibit 1, ¶ 1*. Pursuant to the Warehouse Contract, Interstate stored Eastern Fish's products in the Warehouse and then delivered said products in accordance with instructions from Eastern Fish. *Exhibit 1, ¶ 4*. Eastern Fish paid Interstate for its warehousing services pursuant to the Warehouse Contract. *Exhibit 1, ¶ 5*. As of March 7-8, 2014, Eastern Fish stored a total of 12,430 units of the Food Products in the Warehouse. *Exhibit 1, ¶ 8*. Prior to receipt at the Warehouse, Interstate personnel inspected the Food Products to "validate that there's no cross-contamination or exposed products, that it is sellable." *Exhibit 3, Interstate's Rule 30(b)(6) deposition, p. 26, li. 18-21*. At all times prior to March 8, 2014, the Food Products were in good order and condition. *Exhibit 2, Declaration of Eastern Fish, ¶¶ 3-6; Exhibit 3, p. 27, li. 8-16; p. 28, li. 8-13*.

In the mid-1980s, Interstate constructed Phase 1 of the subject warehouse in Hudsonville, Michigan. *Exhibit 5, Deposition of Nate Tippmann dated June 11, 2015, p. 25, li. 7-9*. Interstate operated the Warehouse since its construction. *Exhibit 5, p. 26, li. 12-15*. In approximately 1991, Interstate added a second phase (Phase 2) to the Warehouse. *Exhibit 5, p. 28, li. 6-8; see also photograph at Exhibit 30 to the deposition of Nate Tippmann dated June 11, 2015, Exhibit 16*. Nate Tippmann was responsible for maintenance of the Warehouse. *Exhibit 5, p. 37, li. 16-19*. Nate Tippmann had no training in snow removal related to the Warehouse. *Exhibit 5, p. 122, li. 1 to p. 123, li. 3*. Nate Tippmann hired Leroy Lozada to work as the maintenance technician and

supervisor in 2012. *Exhibit 5, p. 39, li. 12-22.* Mr. Lozada had no previous experience working at public cold storage facilities, such as the Warehouse. *Exhibit 5, p. 40, li. 7-20.* Mr. Lozada had no background in structural engineering or snow loads on steel roofs of commercial properties. *Exhibit 6, Deposition of Ramon Leroy Lozada dated June 12, 2015, p. 14, li. 3-11.* Mr. Lozada had never worked in a commercial building similar to the Warehouse. *Exhibit 6, p. 25, li. 3-6.* No one on the maintenance staff had a background in building construction, roofing work or building maintenance. *Exhibit 5, p. 73, li. 11 to p. 74, li. 7.*

During the time preceding the Roof Collapse, Nate Tippmann, Mr. Lozada or temporary maintenance employees would inspect the roof of the Warehouse on a monthly basis. *Exhibit 5, p. 66, li. 13-17.* Nate Tippmann knew of no written procedures for roof inspections for Interstate prior to March 8, 2014. *Exhibit 5, p. 68, li. 3-12.* Interstate had no written procedures regarding snow removal from the roof of the Warehouse. *Exhibit 5, p. 118, li. 9-17.* Nate Tippmann never consulted with professionals regarding when it would be appropriate to remove snow from the roof of the Warehouse. *Exhibit 5, p. 121, li. 22-25.* Nate Tippmann never asked a structural engineer whether it would be appropriate to remove snow from the roof of the Warehouse under certain circumstances. *Exhibit 5, p. 122, li. 1-5.* Nate Tippmann never received any instruction or training with respect to removal of snow accumulation on the roof of the Warehouse. *Exhibit 5, p. 122, li. 6 to p. 123, li. 3.* Interstate had no plans or policies with respect to snow events or snow removal. *Exhibit 5, p. 250, li. 2-14.*

As of February 3, 2014, the Warehouse had snow accumulation and snow drifts of three to four feet on the Phase 1 roof, noted during an investigation of an ammonia odor. *Exhibit 5, p. 143, li. 11 to p. 144, li. 25.* Nate Tippmann grew concerned about the snow accumulation on the roof of the Phase 1 Warehouse by February 17, 2014. *Exhibit 5, p. 159, li. 11-16.* As of February 20,

2014, Nate Tippmann was so concerned about the snow accumulation on the Warehouse roof that he notified Andrew Bobay, Corporate Engineer in charge of all Interstate warehouses, Matthew Helbling, Senior Vice President of Operations for Interstate, and Jeff Carteaux, Nate Tippmann's direct supervisor. *Exhibit 5, p. 153, li. 12-17; p. 156, li. 11 to p. 157, li. 7; See also email from Nate Tippmann dated February 20, 2014, Exhibit 14 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 7.* Andrew Bobay never took any courses involving structural engineering. *Exhibit 8, Deposition of Andrew Bobay, p. 21, li. 1-3.* Mr. Bobay never had any employment that was primarily focused on roofs or their structural components. *Exhibit 8, p. 21, li. 4-12.* Mr. Bobay is not a licensed engineer. *Exhibit 8, p. 27, li. 21 to p. 28, li. 6.* Neither Mr. Bobay, nor Nate Tippmann, knew the amount of weight the roof of the Warehouse could safely hold prior to the Roof Collapse. *Exhibit 8, p. 82, li. 2 to p. 84, li. 4; See also Exhibit 7.*

Nate Tippmann specifically asked Andrew Bobay regarding the roof's ability to handle the snow load on February 20, 2014:

> Andy,
>
> We are at 26 inches of compressed snow with the bottom 6 inches being ice and slush(drifts along the walls are about 4 feet deep). How does this compare to our roof design spec? Are we still okay?
>
> Thank you.

*Exhibit 7.* Nate Tippmann did not know how much snow the roof of the Warehouse was designed to handle. *Exhibit 5, p. 162, li. 3-17.* Following the emails with Mr. Bobay, Nate Tippmann notified his team to listen for noises that could be a precursor to a roof collapse. *Exhibit 5, p. 165, li. 10 to p. 166, li. 6; See also Nate Tippmann email dated February 20, 2014, Exhibit 16 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 9.*

Andrew Bobay reached out to an independent structural engineer with respect to the Warehouse roof's ability to hold snow. *Email from Andrew Bobay dated February 20, 2014, Exhibit 15 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 10.* The structural engineer had previously visited the Warehouse some years prior. *Exhibit 5, p. 163, li. 17 to p. 164, li. 2.* The structural engineer was never advised of the amount of snow and ice on the Warehouse roof prior to the Roof Collapse. *Exhibit 5, p. 255, li. 13-16.*

On February 21, 2014, Nate Tippmann advised Andrew Bobay that the entire Phase 1 roof of the Warehouse had over twenty inches of accumulated snow. *See Nate Tippmann email dated February 21, 2014, Exhibit 18 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 11.* Mr. Bobay received a response from the structural engineer on the same day, but the information from the engineer involved the Phase 2 roof of the Warehouse, instead of the Phase 1 area of the Warehouse that was of concern. *Exhibit 5, p. 179, li. 18 to p. 180, li. 4.* Regardless, the structural engineer provided Interstate with an estimate that the Warehouse roof could handle a snow load of 38 lbs. *Exhibit 5, p. 177, li. 6-10.* After receiving the information from the structural engineer, Nate Tippmann "went out and got approximately one cubic foot – and I say 'approximately,' as it was – I did not measure it – but what – it seemed to be about a cubic foot of snow and weighed it." *Exhibit 5, p. 180, li. 18-22.* On February 21, 2014, Nate Tippmann reported to Andrew Bobay as follows:

> Andy,
>
> I scooped approximately one cubic foot of snow and put it on the scale. It was 20 lbs.
>
> You were right, we are probably very close to this design spec.

*Exhibit 5, p. 181, li. 10 to p. 182, li. 9; See also Exhibit 21 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 12.*

As of February 21, 2014, Interstate knew that the measurement of "26 inches of compressed snow with the bottom 6 inches being ice and slush(drifts along the walls are about 4 feet deep)…" had estimated weights calculated as follows:

| 26 inches of compressed snow/ice | Snow drifts – four feet deep |
|---|---|
| 1 cubic foot = approx. 20 lbs. | 1 cubic foot = approx. 20 lbs. |
| 26 inches = 2.167 cubic feet | 4 cubic feet x 20 lbs. = 80 lbs. |
| 2.167 cubic feet x 20 lbs./feet = 43.34 lbs. | |

*See Exhibit 7.* Therefore, Interstate had estimated information that the Warehouse roof was overloaded as of February 21, 2014, over two weeks before the Roof Collapse.

Interstate's corporate management grew concerned with the snow and ice accumulation. Interstate's management, including the president of the company, participated in a conference call on February 21, 2014, after Nate Tippmann took the snow measurement. *Exhibit 5, p. 186, 21 to p. 187, li. 19.* As Nate Tippmann stated: "I was concerned." *Exhibit 5, p. 187, li. 19.* During the call, Nate Tippmann was instructed to "inspect the structural steel for signs of strain." *Exhibit 5, p. 188, li. 18-19.* Nate Tippmann was also instructed "to make sure that no one was walking in the middle of the roof and to limit traffic as much as possible on the roof." *Exhibit 5, p. 188, li. 23-25.*

To inspect the structural steel, Nate Tippmann stood inside the building at floor level and looked at the ceiling approximately twenty-five feet above. *Exhibit 5, p. 190, li. 22 to p. 191, li. 14.* Due to the product stored on racks within the Warehouse, it was not possible to see the steel joists in the area that ultimately failed. *Exhibit 6, p. 131, li. 13 to p. 132, li. 2.* Mr. Bobay did not know how Nate Tippmann conducted his inspections of the structural steel prior to the roof collapse. *Exhibit 8, p. 116, li. 9 to p. 117, li. 10.* As of February 24, 2014, Mr. Bobay instructed Nate Tippmann to keep people off the Warehouse roof to avoid a potential collapse. *Exhibit 8, p. 139, li. 21-23 and p. 145, li. 21 to p. 146, li. 9.* No one inspected the steel joists that ultimately failed between February 24, 2014 and March 8, 2014 (the date of the Roof Collapse). *Exhibit 6, p.*

*135, li. 21 to p. 136, li. 7.* Nate Tippmann and Leroy Lozada continued to look for signs of structural strain in the coming weeks. *Exhibit 24-29 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 13; See also Exhibit 5, p. 201, li. 12-18.* After March 3, 2014, Nate Tippmann and Leroy Lozada provided each other with verbal reports of the snow accumulation and condition of the Warehouse roof. *Exhibit 5, p. 217, li. 10-17.* On Friday, March 7, 2014, Nate Tippmann believed there was less snow on the roof than in prior weeks. *Exhibit 5, p. 218, li. 22 to p. 219, li. 12.*

Interstate never discussed hiring a structural engineer to examine the structure prior to March 8, 2014. *Exhibit 5, p. 191, li. 22-25; See also Exhibit 1, ¶ 27.* Andrew Bobay discussed shoring the roof from the inside prior to the Roof Collapse. *Exhibit 5, p. 193, li. 16 to p. 194, li. 5.* Interstate had used a commercial roofing contractor for required repairs of the Warehouse roof in previous years. *Exhibit 5, p. 94, li. 6 to p. 95, li. 11.* During February and March of 2014, Interstate hired no commercial roofing contractor to determine if the roof required additional structural support under the snow loads. *Exhibit 1, ¶ 26.* Nate Tippmann searched for a snow removal service on February 21, 2014. *Exhibit 22 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 14; See also Exhibit 5, p. 198, li. 19-21.* However, Nate Tippmann and Andrew Bobay never discussed hiring a company to remove snow from the roof. *Exhibit 5, p. 196, li. 8-11.* During February and March of 2014, Interstate never hired a snow removal company to inspect the snow load on the Warehouse roof to determine if snow and ice could be removed. *Exhibit 1, ¶ 25.* Indeed, between February and March of 2014, Interstate never hired any contractor whatever to examine the structure related to the snow and ice accumulation. *Exhibit 1, ¶ 28.*

Gerry Bollman, an engineer that performs work for Interstate, stated that in order to avoid a roof collapse, a building manager could remove the snow from the roof or shore the roof from

within the warehouse. *Exhibit 15, Deposition of Gerry Bollman, p. 33, li. 12-25*. Mr. Bollman would have most likely recommended such a course of action, if asked. *Exhibit 15, p. 34, li. 10-15*. He was never asked.

On March 8, 2014, the Phase 1 roof of the Warehouse collapsed. *Exhibit 1, ¶ 11; See also Exhibits 31-35 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 16.* Post-collapse photographs show that there was more than a foot of ice accumulated on the Warehouse roof. *Exhibit 5, p. 232, li. 13-16*. Snowdrifts in the area of the Roof Collapse measured approximately six feet. *Exhibit 5, p. 234, li. 5-12*.

Interstate hired structural engineers to inspect the structure on March 8, 2014, following the Roof Collapse. *Exhibit 5, p. 250, li. 21 to p. 252, li. 19*. The structural engineer calculated that the snow and ice accumulation, not including the area with the snowdrifts, overloaded the roof by an initial estimate of 37%. *Exhibit 5, p. 254, li. 2-10; See also SLM & Associates report dated March 10, 2014, Exhibit 41 to the deposition of Nate Tippmann dated June 11, 2015, submitted herewith as Exhibit 17.* However, after examining the code in existence at the time of construction of the Phase 1 warehouse, the engineer determined that Interstate allowed the roof to be overloaded by 68%. *Exhibit 5, p. 255, li. 7-12; See also SLM & Associates report dated March 17, 2014, submitted herewith as Exhibit 18, at p. 2.*

As of March 8, 2014, after the Roof Collapse, Eastern Fish could not obtain its Food Products stored within the Warehouse. *Exhibit 3, p. 36, li. 21 to p. 37, li. 9*. Eastern Fish could not obtain its Food Products on March 9, 2014. *Exhibit 3, p. 39, li. 14-18*. On March 9, 2014, Interstate advised Eastern Fish of the Roof Collapse. *Document 3-2, p. 4; Exhibit 1, ¶ 13-14*. In a letter dated March 13, 2014, Eastern Fish provided Interstate with notice of its claim for damage to the Food

Products with an estimated value of $2,411,273.00. *Exhibit 19; Exhibit 1, ¶ 15*. On March 14, 2014, Interstate denied responsibility for the loss of the Food Products. *See Document 3-2, p. 5*.

Following the Roof Collapse, the Michigan Department of Agriculture, Food and Dairy Division, visited the Warehouse and seized the Food Products from Interstate. *Exhibit 1, ¶ 16; Exhibit 20*. In addition, the Department of Public Health for Ottawa County, Michigan, issued a similar notice related to the seizure order. *Exhibit 1, ¶ 17; Exhibit 21*. Eastern Fish could not access its Food Products because the government seized the Food Products from Interstate. *Exhibit 3, p. 41, li. 19-23*. Interstate hired its subcontractor to haul the Food Products away from the Warehouse for disposal. *Exhibit 3, p. 45, li. 10-20*. Interstate hired Waste Management to dispose of the Food Products. *Exhibit 3, p. 43, li. 1 to p. 44, li. 5*. Interstate paid Waste Management to dispose of the Food Products. *Exhibit 3, p. 44, li. 6-8*. Interstate sent the Food Products to Waste Management for destruction so Interstate could satisfy its obligations to the Michigan Department of Agriculture and the Department of Public Health for Ottawa County, Michigan. *Exhibit 3, p. 46, li. 23 to p. 47, li. 3*. Eastern Fish could not access the Food Products from the date of the Roof Collapse to the date of disposal by Interstate. *Exhibit 3, p. 36, li. 21 to p. 37, li. 8 and p. 51, li. 19-25*. Eastern Fish did not authorize Interstate to dispose of the Food Products. *Exhibit 2, ¶ 8*.

On March 10, 2014, Aspen engaged a structural engineer, James Goes, to investigate the Roof Collapse. Mr. Goes visited the Warehouse on March 20, 2014, but Interstate did not allow Mr. Goes to move anything that would allow an examination of the point of failure of the roof. *Exhibit 22, p. 1*. On March 20, 2014, Aspen and Eastern Fish (via counsel) advised Interstate that Interstate must preserve evidence related to the Roof Collapse and allow Aspen and Eastern Fish to investigate the loss or Interstate would face consequences for spoliation of evidence. *Exhibit 1, ¶ 19; Document 3-2, p. 6-7*. Mr. Goes then coordinated with Nate Tippmann to investigate the

Roof Collapse and arrived at the Warehouse on March 25, 2014, but Mr. Goes could not access the facility. *Exhibit 22, p. 1-2*. Mr. Goes visited the Warehouse again on April 7, 2014. Interstate had removed the end wall, all product and racking. *Exhibit 22, p. 2*. As Mr. Goes reported:

> LWG arranged to visit the site on April 24, 2014. We specifically asked, if we would be allowed access. Nate Tippman said yes. When we arrived approximately forty feet of the middle of the building was gone including the columns, joist girders, joists, roof deck, roofing material, mechanical systems, and any other materials that were on the roof. More importantly, the damaged parts of the collapsed roof were also gone. There was no structural debris on site. All of it had been hauled away.

*Exhibit 22, p. 2*. Interstate destroyed all evidence related to the Roof Collapse with full knowledge that plaintiff sought to inspect it.

As a result of the Roof Collapse, plaintiff suffered a total loss of $2,634,539.45. *See Exhibit 2, ¶ 9; See Exhibit 23, Cargo Survey Report*. Eastern Fish submitted a claim for the Food Products to its insurer, Aspen, who paid the claim in return for subrogation rights. *Exhibit 2, ¶¶ 9-10*.

## V.     Michigan law applies to this action.[1]

A federal court sitting in diversity applies its own procedural laws, but must apply the substantive laws of the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *First Nat. Bank and Trust Corp. v. American Eurocopter Corp*., 378 F.3d 682, 689 (7th Cir. 2004). "If the laws of more than one jurisdiction arguably are in issue, *Erie* also requires a federal court to apply that state's choice of law rules…Thus, sitting in Indiana, the district court properly looked to Indiana's choice of law rules." (internal citations omitted) *Jean v. Dugan*, 20 F.3d 255, 260-261 (7th Cir. 1994).

The instant motion involves claims of breach of bailment, conversion and gross negligence. Under Indiana law, this court must determine if there is a true conflict "important enough to affect

---

[1] Defendant agrees that Michigan law applies to this action. *Document 36, p. 1-2* ("…Defendant asserts that Michigan law applies….").

the outcome of the litigation." *Simon v. U.S.*, 805 N.E.2d 798, 805 (Ind. 2004) (quoting *Hubbard*

*Manufacturing Co. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987)).

> If such a conflict exists, the presumption is that the traditional *lex loci delicti* rule (the place of the wrong) will apply. *Id*. Under this rule, the court applies the substantive laws of the "the state where the last event necessary to make an actor liable for the alleged wrong takes place." *Id*.

805 N.E.2d at 805.

### A.    There is a true conflict between Indiana and Michigan law.

For purposes of the instant action, applying Indiana law versus Michigan law could affect

the outcome of the litigation. As indicated above, this motion relates to claims for bailment,

conversion and gross negligence. With respect to conversion and gross negligence, Indiana and

Michigan law have different standards applicable to the claims at issue.

### 1.    Conversion.

Under Indiana law, "[c]onversion is a tort involving the appropriation of personal property

of another to the tortfeasor's own use and benefit, to the exclusion of and in defiance of the owner's

rights, under an inconsistent claim of title; *mens rea* is not an essential element." *Indiana and*

*Michigan Electric Co. v. Terre Haute Industries, Inc.*, 507 N.E.2d 588, 610 (Ind. 1987).

In contrast, Michigan law allows for both common law and statutory conversion. Michigan

defines common law conversion as "any distinct act of dominion wrongfully exerted over

another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines &*

*Equipment, Inc. v. Columbian Distribution Services, Inc.*, 871 N.W.2d 136, 144 (Mich. 2015).

Pursuant to MCL 600.2919a, and in addition to common law conversion, Michigan law includes

a provision for statutory conversion. Statutory conversion under Michigan law requires a showing

of common law conversion, with the added showing of conversion "to the other person's own

use." Michigan law defines "own use" as "a purpose personal to the defendant's interests, even if

that purpose is not the object's ordinarily intended purpose." *Aroma Wines*, 871 N.W.2d at 138. In addition, pursuant to MCL 600.2919a, a plaintiff can recover "3 times the amount of actual damages sustained, plus costs and reasonable attorney fees" for statutory conversion claims.

## 2. Gross negligence.

Indiana law does not state whether a defendant can limit its liability for gross negligence claims via contract. In *State Group Indus. (USA) Limited v. Murphy & Assocs. Indus. Servs*., 878 N.E.2d 475, 479 (Ind. Ct. App. 2007), the court noted that Indiana's sister states do hold gross negligence cannot be limited via contract. However, the court did not address whether Indiana permits or precludes such limitations. In contrast, Michigan holds that contractual limitations against gross negligence are against public policy. *Shelby Mut. Ins. Co. v. City of Grand Rapids*, 148 N.W.2d 260, 262 (Mich. Ct. App. 1967) ("While the general rule appears to be that a party may contract against liability for harm caused by his negligence in performance of a contractual duty, he may not do so with respect to his gross negligence.") Here, the application of contractual limitations of liability are at issue, as identified in defendant's pending motion for partial summary judgment. *Document 35*.

## B. This court should apply Michigan law.

Based on the foregoing, the differences between Indiana and Michigan law are outcome determinative. Therefore, "the presumption is that the traditional *lex loci delicti* rule (the place of the wrong) will apply." *Simon v. U.S*., 805 N.E.2d at 805. Here, the parties to the Warehouse Contract agreed to store the Food Products in Hudsonville, Michigan. Interstate took possession of the Food Products in Michigan. The Warehouse was located in Michigan. The Roof Collapse related to the Food Products occurred in Michigan. The destruction of evidence related to the Roof Collapse occurred in Michigan. Finally, defendant's destruction of the Food Products occurred in

Michigan. The place of all of the wrongs complained of, including the final destruction of the Food Products (the last event), occurred in Michigan. As a result, Michigan law must apply to this action.

### VI.   Defendant is liable for breach of bailment of the Food Products.

Pursuant to Michigan law, Interstate "is liable for damages for loss of or injury to the goods caused by its failure to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances." MCL § 440.7204(1). In order to establish a *prima facie* bailment claim, the bailor must establish the existence of a bailment and that the property is returned in a damaged condition, thus creating a presumption of negligence. *Columbus Jack Corp. v. Swedish Crucible Steel Corp.*, 227 N.W.2d 506 (1975).

> [W]here the bailed property is lost, damaged or stolen, while it was in the exclusive control of the bailee, he should be charged with the burden of going forward to rebut the presumption with evidence to establish that the loss, damage or theft was occasioned without his fault.

*Columbus Jack Corp.*, 227 N.W.2d at 510-511.

Here, Interstate acted as bailee of the Food Products pursuant to an agreement. *Exhibit 1, ¶ 1-8*. Interstate inspected the condition of the Food Products when received to "validate that there's no cross-contamination or exposed products, that it is sellable." *Exhibit 3, p. 26, li. 18-21*. At all times prior to March 8, 2014, the Food Products were in good order and condition. *Exhibit 2, ¶¶ 3-6; Exhibit 3, p. 28, li. 8-13*. The Food Products suffered damage while in Interstate's possession. *Exhibit 1, ¶ 11-17*. Following the Roof Collapse, Interstate would not allow Eastern Fish to access the Food Products. *Exhibit 3, p. 41, li. 19-23*. Interstate hired its subcontractor to haul the Food Products away from the Warehouse for disposal. *Exhibit 3, p. 45, li. 10-20*. Interstate hired Waste Management to dispose of the Food Products. *Exhibit 3, p. 43, li. 1 to p. 44, li. 5*. Interstate paid Waste Management to dispose of the Food Products. *Exhibit 3, p. 44, li. 6-8*. As a result of Interstate's breach of the bailment, Aspen has suffered damages in the total amount of

$2,634,539.45. *See Exhibit 2, ¶¶ 9-10; See Exhibit 23, Cargo Survey Report*. Plaintiff has established its *prima facie* bailment claim.

In order to rebut the *prima facie* case for bailment, Interstate is required to provide evidence that the loss occurred "without [its] fault." *Columbus Jack Corp.*, 227 N.W.2d at 510-511. Here, Interstate cannot show that it was free from fault. The evidence clearly establishes that Interstate had the time, information and opportunity to take some action to prevent the Roof Collapse. Despite knowledge that the Warehouse roof had significant snow loads, Interstate never hired any structural engineer, roofing contractor or snow removal service to physically examine the situation and suggest preventative solutions. Interstate took no action whatever in the face of overwhelming information related to the weight of the snow on the Warehouse roof. Interstate cannot show that the Roof Collapse occurred without its fault. Therefore, Interstate cannot overcome the *prima facie* case of bailment.

### VII.   Interstate converted the Food Products under both common law and MCL § 600.2919a.

In *Aroma Wines & Equipment, Inc. v. Columbian Distribution Services, Inc*., 871 N.W.2d 136, 297 Mich. 337 (Mich. 2015), the Michigan Supreme Court provided firm precedence on conversion in an analogous action involving wine damaged while stored in a defendant's warehouse. In *Aroma Wines*, plaintiff, a wine distributor, hired defendant to store wine in its temperature-controlled warehouse. Plaintiff failed to make payments for storage and defendant claimed lien rights over the wine. At some point, defendant moved plaintiff's wine from temperature-controlled storage to an uncontrolled storage area, claiming it needed to renovate the temperature-controlled area. Plaintiff alleged that the change of temperature resulting from moving the wine made the wine unfit for sale and sued the warehouse for conversion under Michigan law. At trial and after plaintiff rested its case, defendant moved for a directed verdict on plaintiff's claim

for statutory conversion only. Defendant argued that plaintiff failed to show that the wine was converted for its "own use," claiming that "own use" required a showing that the wine was converted for a purpose "intended by the nature of the product…." The trial court agreed with defendant and granted a directed verdict on the statutory conversion claim. Trial proceeded on the common law conversion claim (among others) and the jury found defendant guilty of conversion.

After trial, plaintiff appealed the trial court's order granting a directed verdict on statutory conversion and the appellate court reversed, finding the trial court's interpretation of "own use" too narrow. *Aroma Wines & Equipment, Inc. v. Columbian Distribution Services, Inc*., 844 N.W.2d 727, 303 Mich.App. 441 (Mich.App. 2013). The defendant did not challenge the finding of common law conversion on appeal.  The Michigan Supreme Court granted the parties' applications for leave to appeal and affirmed.

In its opinion, the Michigan Supreme Court detailed the history of conversion. Michigan law recognizes causes of action for both common law and statutory conversion. A plaintiff can recover under common law by showing that defendant engaged in "any act of dominion inconsistent with that person's rights in that property." *Aroma Wines*, 871 N.W.2d at 145. For statutory conversion, plaintiff must also show that the defendant converted the property to its "own use." MCL 600.2919a; see also *Aroma Wines*, 871 N.W.2d at 146.

> Therefore, we agree with the Court of Appeals' definition of "use" and hold that conversion "to the other person's own use" requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose.

*Aroma Wines*, 871 N.W.2d at 148. The court held that defendant's act of moving the wine to renovate its temperature-controlled storage area satisfied the "own use" requirement for statutory conversion. *Id*. at 149.

Here, Interstate never had the right to subject to Food Products to ammonia and temperature damage. Interstate never had the right to deny Eastern Fish access to the Food Products. Interstate never had the right to allow a third-party to seize the Food Products. Interstate never had the right to destroy the Food Products. Interstate only had the right to store the Food Products and return them to Eastern Fish when directed to do so.

> **(a)** **Interstate is liable for common law conversion of the food products.**

As previously discussed, "common-law conversion is now well-settled in Michigan law as any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." (internal quotations and citations omitted). *Aroma Wines*, 871 N.W.2d at 144. In its discussion of the history of common law conversion, the court noted:

> Justice COOLEY's 1874 decision for this Court in *Kreiter v. Nichols* involved the conversion of beer and emphasized that if someone "converts [beer] to his own use in any form, a civil action will lie to recover from him the value," and "this civil action would not depend in any degree upon the method or purpose of the conversion."

*Id*. at 143-144. "…[B]y the twentieth century common-law conversion more broadly encompassed any conduct inconsistent with the owner's property rights." *Id*. at 145.

Here, Interstate's conduct was inconsistent with Eastern Fish's rights over the Food Products. Interstate acknowledged that Eastern Fish could not obtain possession of the Food Products after the Roof Collapse.

> Q.   Is it fair to say that the goods stored, within the area of the structural failure, could not be accessed for purposes of releasing to truckers?
> A.   At what time?
> Q.   At any time on March 8, 2014, after the collapse?
> A.   And you're asking in regard to the impacted area of Phase I?
> Q.   Correct.
> A.   That is correct.

*Exhibit 3, p. 36, li. 21 to p. 37, li. 8*.

> Q.   So is it fair to say that Eastern Fish did not have access to the food products it had stored in the Hudsonville Warehouse as of March 9th, 2014?
>
> A.   For a brief period of time.

*Exhibit 3, p. 39, li. 14-18*.

In correspondence dated March 12, 2014, Brad Hastings (Senior Vice President of Interstate), advised Eastern Fish that its Food Products were unavailable:

> Following the incident at IWI Hudsonville on Saturday, March 8, 2014, the staff at Interstate has been working diligently to get direction from governmental agencies to determine the status and availability of the product that is still in the building.

*Document 3-2, p. 4 of 9*. "While it is a conversion where one takes the plaintiff's property and sells or otherwise disposes of it, it is equally a conversion if he takes it for a temporary purpose only…." (internal quotations omitted) *Aroma Wines*, 871 N.W.2d at 150-151.

However, the evidence establishes that Interstate never allowed Eastern Fish access to the Food Products after the date of the Roof Collapse:

> Q.   And between the collapse and the date of disposal, it's fair to say that Eastern Fish could not have went and received their products back from Interstate, correct?
>
> A.   No product was removed outside of our disposal process.

*Exhibit 3, p. 51, li. 19-25*. Interstate then hired Waste Management to destroy the Food Products in order to satisfy Interstate's own obligations to governmental authorities. *Exhibit 3, p. 46, li. 23 to p. 47, li. 3*. Eastern Fish did not authorize Interstate to dispose of the Food Products. *Exhibit 2, ¶ 8*. Therefore, plaintiff has established that Interstate is liable for common law conversion of the Food Products.

**(b)     Interstate converted the Food Products to its "own use," and is liable for statutory conversion.**

In addition to its liability for common law conversion, Interstate is liable for statutory conversion under MCL § 600.2919a, which states:

(1)     A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a)     Another person's stealing or embezzling property or converting property to the other person's own use.
* * *
(2)     The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

As recited above, a plaintiff can recover under common law by showing that defendant engaged in "any act of dominion inconsistent with that person's rights in that property." *Aroma Wines*, 871 N.W.2d at 145. For statutory conversion, plaintiff must also show that the defendant converted the property to its "own use." MCL 600.2919a; *see also Aroma Wines*, 871 N.W.2d at 146. The "own use" requirement means "that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." 871 N.W.2d at 148.

Interstate intentionally caused the destruction of the Food Products to satisfy its obligations to the state of Michigan and local government under the Notice of Seizure. As Brad Hastings stated in his correspondence to Eastern Fish dated March 12, 2014:

On Tuesday, March 11, we received notification from the Ottawa County Department of Public Health that we must remove and properly dispose of the remaining food that is still in the building. (see attached letter and seizure notice for details).

A couple of other important points of information:

• Arrangements are currently being made for the disposal and destruction of the affected product, and that process will be witnessed by a

representative of the Michigan Department of Agriculture, who issued the seizure notice.

- Security and management presence is being maintained onsite 24 hours a day at this point and that will be the case until all remaining product still onsite is properly disposed of.

*Document 3-2, p. 4 of 9*. Nate Tippmann, General Manager of the Warehouse, agreed that Interstate destroyed Eastern Fish's Food Products to satisfy its obligations to the authorities.

> Q.    And is it fair to say that Interstate sent the food products to the Waste Management facility to satisfy the obligations under the notice of seizure from the governmental organizations?
>
> A.    Yes.

*Exhibit 3, p. 46, li. 23 to p. 47, li. 3*. This was a "purpose personal to the defendant's interest." *Aroma Wines*, 871 N.W.2d at 148. The governmental authorities placed the obligation on Interstate to destroy products affected by the Roof Collapse. Interstate satisfied their obligation to the governmental authorities by having the Food Products destroyed. Therefore, Interstate converted the Food Products to their own use, as defined by Michigan law.

### (c)    Treble damages and attorney fees for statutory conversion.

Pursuant to MCL 600.2919a, when a plaintiff proves statutory conversion, they "may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees." This remedy "is in addition to any other right or remedy the person may have at law or otherwise." *Id*. Therefore, plaintiff is entitled to three times its damages of $2,634,539.45, or $7,903,618.35. In addition, plaintiff is entitled to an award of its attorney fees.

### VIII.    Interstate was grossly negligent in its failure to take any reasonable action to prevent the Roof Collapse.

Michigan law defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." *Smith v. Township of Prairieville*, 194 F.Supp.3d 658, 675 (W.D.Mich. 2016). "It is an 'almost…willful disregard of precautions or

measures to attend to safety and a singular disregard for substantial risks.' " (internal citations omitted) *Id.* at 674-675.

Interstate had the duty to maintain the Warehouse, but failed to do so. As shown above, Interstate had unskilled, untrained people evaluating the snow load on the Warehouse roof, without any knowledge whatever of the Warehouse roof's tolerance for snow loads. Interstate had unqualified people inspecting the interior roofing joists without the ability to investigate critical joists where snow drifts were highest. Interstate's unqualified inspectors were without the knowledge to understand why those joists were important. Interstate discussed the situation with a structural engineer, but never provided the engineer with the crucial information necessary to determine if the Warehouse roof was overloaded. Interstate discussed shoring the Warehouse roof from the inside, but never asked a roofing contractor to inspect the Warehouse to determine if the snow load effected the structural integrity of the roof. Interstate discussed removing snow from the Warehouse roof, but never asked a snow removal service to examine the Warehouse to determine how the snow load could be reduced or removed. Interstate knew that the snow load on the Warehouse roof was so dangerous that employees were not allowed to walk on the roof, but did nothing to address the dangerous condition.

Indeed, as shown in Exhibit 24, a report from snow removal expert, Jeremy Swensen, Interstate violated industry standards and could have and should have had snow loads drastically reduced. As Mr. Swensen stated in his report: "it is my opinion that the rooftop collapse…could have been easily avoided if Interstate Warehouse, Inc. would have applied a reasonable amount of effort to research and train their managers and employees regarding rooftop snow conditions and removal." *Exhibit 24, p. 22-23*. Mr. Swensen noted that Interstate failed to have any snow removal plan, failed to have basic knowledge regarding the specifications of the Warehouse roof and failed

to consult professionals to evaluate the situation. *Exhibit 24, p. 9-24*. Further, as Mr. Swensen notes (and common sense dictates): "if the amount of snow on a roof ever reaches the point where a commercial property manager or building owner is afraid to have anyone walk on it for fear of collapse that the snow needs to be removed from the rooftop to alleviate the dangerous condition." *Exhibit 24, p. 16*.

Reports from Interstate's structural engineer hired after the Roof Collapse show that the Warehouse roof was overloaded by 68%, not including areas where drifting snow measured up to six feet. *Exhibit 5, p. 255, li. 7-12; Exhibit 18*. Interstate's feeble conference calls and discussions without action in the face of an obvious and serious risk to people and property demonstrates that Interstate was "so reckless as to demonstrate a substantial lack of concern for whether injury results." The fact that no one at Interstate knew the design specifications of the Warehouse roof and no one knew how to find the design specifications of the Warehouse roof, critical information for a warehouse in Western Michigan, was "so reckless as to demonstrate a substantial lack of concern for whether injury results." Faced with a significant risk of injury to people and property, and with the knowledge that no one in the organization had the training or experience to properly evaluate the risk of collapse, Interstate never hire a professional to examine the Warehouse to determine the risk and suggest preventative action. This failure was "so reckless as to demonstrate a substantial lack of concern for whether injury results." Interstate's gross negligence caused the Roof Collapse and the ultimate loss of the Food Products. As a result, plaintiff has been damaged, as stated herein.

Under the circumstances, reasonable minds could not differ as to whether Interstate's conduct constituted gross negligence. Taking no action whatever when it was obvious that there was a substantial risk of the Warehouse roof collapsing constitutes gross negligence.

IX.     Prejudgment interest.

"In diversity actions such as this case, a federal court must look to state law to determine the propriety of prejudgment interest on a recovery." *Travelers Ins. Co. v. Transport Ins. Co*., 846 F.2d 1048, 1051 (7th Cir. 1988) (citing *Simmons, Inc. v. Pinkerton's, Inc*., 762 F.2d 591, 607 (7th Cir.1985)). Prejudgment interest is allowed under Michigan law. MCL § 600.6013. Plaintiff is entitled to prejudgment interest from the commencement of this action through the date of judgment. *See, for example, Hunt v. Hadden*, 159 F.Supp.3d 800, 811-812 (E.D.Mich. 2016). The prejudgment interest rate is "equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually." MCL § 600.6013(8); *See also Hunt*, 159 F.Supp.3d at 812. The Michigan State Treasurer certified a rate of 2.687% for the six months immediately preceding July 1, 2018.[2] Therefore, plaintiff is entitled to prejudgment interest at a rate of 3.687% (1% plus the average interest rate).

Plaintiff initiated this action on December 5, 2014. *Document 1*. Plaintiff's damages (excluding damages awarded for statutory conversion, per above) are $2,634,539.45. *See Exhibit 2*. As of December 4, 2018, plaintiff is entitled to prejudgment interest calculated as follows:

| Dates | Principal | Interest | Total |
|---|---|---|---|
| December 5, 2014 to December 4, 2015 | $  2,634,539.45 | $       97,135.47 | $  2,731,674.92 |
| December 5, 2015 to December 4, 2016 | $  2,731,674.92 | $     100,716.85 | $  2,832,391.77 |
| December 5, 2016 to December 4, 2017 | $  2,832,391.77 | $     104,430.28 | $  2,936,822.06 |
| December 5, 2017 to December 4, 2018 | $  2,936,822.06 | $     108,280.63 | $  3,045,102.69 |

Total Interest:     $     410,563.24

---

[2] See Michigan State Treasurer's website: https://www.michigan.gov/treasury/0,4679,7-121-44402_44404-107013--,00.html.

After December 5, 2018, to the date of judgment, interest will accrue at $307.60 per day.[3]

### X.    Conclusion.

Defendant is liable for the loss of Food Products, as stated herein. There is no question of material fact and plaintiff is entitled to judgment as a matter of law.

Respectfully submitted,

ASPEN AMERICAN INSURANCE CO., as subrogee of Eastern Fish Company, plaintiff,

s/ Timothy S. McGovern

Its attorney

Timothy S. McGovern (Illinois #6275492)
SWANSON, MARTIN & BELL, LLP
330 North Wabash – Suite 3300
Chicago, Illinois 60611
Tel.: (312) 321-9100
Fax: (312) 321-0990
Email: tmcgovern@smbtrials.com

---

[3] The daily rate is calculated as follows: Principal ($3,045,102.69) x Interest Rate (3.687%) = Annual Interest ($112,272.94), divided by 365 = $307.60.