```
 1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
 2                      FORT WAYNE DIVISION

 3
     ASPEN AMERICAN INSURANCE    )
 4   CO., as subrogee of         )
     Eastern Fish Company,       )
 5                               )   Case No.
              Plaintiff,         )   1:14-cv-00383-WCL-SLC
 6                               )
       vs.                       )
 7                               )
     INTERSTATE WAREHOUSING,     )
 8   INC.,                       )
                                 )
 9            Defendant.         )

10

11

12
                 DEPOSITION OF JEREMY E.  SWENSON
13

14          TAKEN ON BEHALF OF THE PLAINTIFFS

15
                      OCTOBER 25, 2018
16

17

18

19

20

21

22

23

24

25
```



1  would have for that regard?

2      A.   Well, we -- we do the IRS regional

3  headquarters downtown, and when they were building

4  their regional facility -- it's holds 8,000 employees,

5  works 24 hours a day.  They consult with me to come

6  down and work with them on a snow and ice removal

7  operations plan for their facility.

8      Q.   Okay.  And was that snow and ice removal

9  limited to street level or surface level snow and ice

10  removal or did it involve snow and ice removal on the

11  tops of the buildings as well?

12      A.   They were not concerned about the tops of

13  the buildings there, but I do consult all the time on

14  elevated surfaces, parking garages, decks; and I do

15  get consulted about, you know, when there's heavy

16  snows regarding snow on rooftops and blowing and

17  drifting and melting and refreezing.

18      Q.   Have you ever been retained to consult with

19  a business or businesses in order to help them figure

20  out how they can make more money from snow and ice

21  removal operations?

22      A.   No.

23      Q.   To date, have you been paid for your case

24  by Aspen American or Mr. McGovern's firm?

25      A.   Yes.

```
 1          Q.    About how much have you been paid to date?
 2          A.    Around $4,400.
 3          Q.    Have you charged an hourly rate for your
 4    services performed thus far?
 5          A.    Yes.
 6          Q.    What's your hourly rate that you charged?
 7          A.    It's $195 an hour for case review and $295
 8    an hour for depositions, report writing or trial.
 9          Q.    So I assume by virtue of that you're
10    charging me $295 an hour to give your testimony today?
11          A.    Yes.
12          Q.    Did you review any materials today
13    preparing for your deposition?
14          A.    Yes.
15          Q.    What did you review?
16          A.    I reviewed my notes.  I reviewed my report
17    and I glanced over pictures and just kind of went over
18    my file.
19          Q.    And with respect to the depositions that
20    you identified in Exhibit 1, did you read every page
21    of those depositions or were you provided summaries of
22    those deposition by other people?
23          A.    No, I read them all.
24          Q.    Therefore, as I recall your report, you
25    read depositions from Mr. Bobay and Mr. Tippman; is
```

```
 1   that correct?
 2        A.   Yes.
 3        Q.   Do you recall reading other depositions
 4   from other individuals?
 5        A.   No.
 6        Q.   So you focused simply on those two then?
 7        A.   Let me look here.  I believe that is true.
 8   That was my main focus, yes.
 9        Q.   Now, at the present time with respect to
10   Snowmen, Inc., would it be fair to say that the vast
11   majority of the activities of Snowmen, Inc., including
12   your activities, involved things such as shoveling off
13   sidewalks, chipping ice with ice scrapers, removing
14   snow in commercial parking lots and businesses and
15   operating, as I think I've read somewhere, over 200
16   pieces of plow and salt equipment during snow and ice
17   events in the Kansas City area?
18        A.   Yes.
19        Q.   At the present time, do you have any
20   contracts with any warehouse facilities regarding an
21   analysis of rooftop snow and ice removal?
22        A.   No.
23        Q.   To your knowledge, with respect to the
24   warehouse companies you have consulted with, did any
25   of those companies utilize employees to go up on the
```

1   roof during snow events and make observations of snow

2   conditions and do such things as open drains so that

3   melt runoff could drain off the roof?

4           MR. MCGOVERN:  Objection to form.  He's

5   testified he was consulted post-collapse.

6       A.    Yeah.  I was a consultant post-collapse to

7   the buildings that collapsed, but I am aware that this

8   is standard procedure in the industry for properties

9   that are large that have flat roofs.

10      Q.    (By Mr. Gaston)  Okay.  And with respect to

11  the companies with whom you've consulted, let's say,

12  in the last five years, warehouse companies, did any

13  of those companies utilize employees to go up on the

14  roofs to make observations about snow conditions and

15  depths and also keep drains clean?

16      A.    I'm not aware of what their procedures

17  were.

18      Q.    And what companies in the last five years

19  have you consulted with regarding just snow and ice

20  removal operations for the warehouse company?

21      A.    Specifically for a warehouse company -- I

22  mean, I've never really looked at it like Was it just

23  a warehouse company.  We do lots and lots of

24  commercial and industry warehouse-type buildings.  I

25  get consulted to talk about -- I mean -- to look at

1  their flat roofs.  I don't really know if they're --

2  some of them have warehouses.  Some of them have

3  refrigerated.  Some of them don't.  I'm not really

4  sure of the percentage and that sort of thing.

5          Q.   Would it be fair to say, though, that none

6  of these companies have ever retained you to actually

7  go up on the roof and make an observation of a snow

8  condition?

9          A.   That's true.

10         Q.   Would you consider it to be a prudent

11  action for a warehouse operator to make sure that

12  drains are open so that drainage can occur from snow

13  melt and ice melt runoff?

14         A.   Yes.

15         Q.   And would you consider it a prudent action

16  on the part of a warehouse operator to make

17  observations of roof conditions to make sure drains

18  are open?

19         A.   Yes.

20         Q.   Now, if I understand Exhibit 1 -- and,

21  again, I'm not going to go through it line by line

22  here.  It's my understanding that you have rendered

23  certain opinions regarding your analysis of the

24  activities involved with the roof collapse at

25  Hudsonville, correct?

1          A.    Correct.

2          Q.    And if I understand your report

3    correctly -- and help me out if I'm wrong -- it's your

4    opinion that Interstate Warehousing failed to exercise

5    reasonable care which more likely than not caused the

6    roof of its warehouse at Hudsonville, Michigan, to

7    collapse on March 8, 2014, and that these failures

8    consisted of the following things:  One, not having a

9    written snow removal plan/policy in place regarding

10   observation and snow removal; two, by not removing

11   snow off the rooftop, either by internal means or by

12   retention of a snow removal company; three, by not

13   securing snow-load calculations for the rooftop by a

14   structural engineer and, finally, by failing to make

15   drainage paths and clear roof drains so that ice and

16   snow melt-off could occur.

17              Does that sound generally what your

18   opinions are in this case?

19         A.    Well, my opinions are stated in my report.

20   I do know that they did -- they did have a system in

21   place to check and clear paths to the scuppers on the

22   rooftop.  My main issue with that was that there was

23   blowing and drifting, up 3- and 4-foot drifts; and it

24   is my understanding from the case files that they did

25   not go through the drifts.  There's a standard

```
 1   procedure in the industry to go through major drifts
 2   so that the water in the drift areas can drain and go
 3   to the scuppers.  It's my understanding that they did
 4   not do that, which is a -- and that was where the
 5   collapse occurred, was where the blowing and drifting
 6   happened.
 7           So I -- and then as far as the written
 8   plan, I don't think you have to have a written plan.
 9   I think it's a good idea to have a written plan.  A
10   verbal plan would be just fine, but they did not have
11   a verbal plan to remove excess snow and ice from the
12   rooftop.  So the plan wouldn't have to be in writing.
13   It could be verbal.
14           They did have a plan.  They did have people
15   going up and checking.  I'm aware of that.  And they
16   had people clearing paths to scuppers.  But it's my
17   understanding from the case files that as the snow got
18   to be more and more and more, they became very
19   concerned.  Andy was concerned to even -- Andy and
20   Nate didn't even want to send anybody up there on the
21   roof because they thought it might collapse.  And at
22   that point if you're not sending anybody up on the
23   roof at all, then I'm not sure that they were clearing
24   paths to the scuppers.
25       Q.   You don't know exactly what paths were
```

```
 1   cleared and what paths were not cleared by the

 2   Interstate Warehousing folks, correct?

 3        A.   They didn't say in the deposition that they

 4   weren't clearing it through the drifts.

 5        Q.   But as far as the extent of the actual path

 6   clearing, drain clearing, you don't know exactly how

 7   many paths were made and how many drains were cleared,

 8   correct?

 9        A.   Correct.

10        Q.   But what you do agree, though, is that

11   Interstate Warehousing at the time of the collapse in

12   March of 2014 did have a verbal plan to conduct

13   observations of the rooftop, correct?

14        A.   Yes.

15        Q.   And at the time of the collapse in March of

16   2014, Interstate Warehousing did have a plan regarding

17   cleaning pathways and cleaning drains for the scuppers

18   so that ice melt and snow melt could drain off,

19   correct?

20        A.   They did.

21        Q.   Your criticism is primarily with whether or

22   not they made any efforts to clean out through the

23   drifted areas and take appropriate actions to deal

24   with depths of snow?

25             MR. MCGOVERN:   Objection.   His opinions are
```

```
 1   stated in the report.
 2        A.   Yes.   My opinions are stated specifically
 3   in my report.
 4             MR. GASTON:   Move to strike counsel's
 5   coaching of his witness, by the way.
 6        Q.   (By Mr. Gaston)   Go ahead.   You don't need
 7   any help.
 8        A.   There also is the issue of once the snow
 9   reached 23 inches and they're aware that there was
10   melting and refreezing and thick ice underneath, those
11   are the really dangers of a rooftop for collapse.   So
12   they also were aware of that and did not do anything
13   to remove the snow.
14             From reading the case file, it's my
15   understanding they simply were not aware that there
16   was a way to remove the snow.   They felt like you had
17   to bring heavy equipment up there.   They were just
18   untrained as far as just policies and procedures that
19   are standard in the industry to remove snow off the
20   rooftop.   And because they didn't know that, they just
21   let it sit and that was the reason for the collapse as
22   well.
23        Q.   So you're simply saying that
24   notwithstanding the fact that Interstate had some
25   policies in place, a verbal policy in place, for
```

```
 1   observation and drainage and so on, it didn't do
 2   enough, that it needed to do more to make sure things
 3   were clear and engage in snow removal activities?
 4        A.   Yes.  I think the policies for the scupper
 5   drains were good, but when you get to a certain --
 6   there's a certain point when you receive a large
 7   amount of snow and melting and refreezing and ice.
 8   They even admitted in their depositions that they were
 9   afraid of collapse, that they were so worried they
10   didn't even want to send people up on the roof.  And
11   if you ever get to the point to where you're afraid
12   that one person or persons will collapse your roof, it
13   would be standard in the industry that is the time
14   when you need to have the snow removed.
15        Q.   Okay.  You would agree, though, that
16   Interstate Warehousing made a good decision not to
17   endanger the safety of a person, correct?
18        A.   I agree.  That's why they should have
19   called a professional.
20        Q.   So that was a prudent move on their part
21   not to endanger anyone's safety, correct?
22        A.   It's good not to endanger the safety, but
23   there are professionals that go up in those situations
24   and are consulted to remove the snow.
25        Q.   And, in fact, didn't Interstate also
```

```
 1   consult a structural engineer to help analyze
 2   snow-load issues?
 3        A.    They did, but it's my understanding they
 4   never heard back in time.
 5        Q.    So they simply didn't get a quick enough
 6   response then?
 7        A.    Yes.
 8        Q.    So is it your testimony today in this case
 9   that Interstate Warehousing intentionally tried to let
10   that roof collapse?
11        A.    I don't believe they intentionally let
12   it -- tried to let it collapse.  I believe it was just
13   that they were not professional, they were not
14   trained.  There seemed -- I have seen this many times,
15   where people just seem to think It's fine.  We get a
16   lot the snow.  You know, all the other buildings in
17   the area have a bunch of snow.  They're not
18   collapsing.  And they simply failed to respond to a
19   potentially dangerous situation quick enough.
20        Q.    Are you aware of any evidence that
21   Interstate Warehousing intentionally tried to let this
22   roof collapse in Hudsonville?
23        A.    No, I don't believe it was intentional.
24        Q.    Are you aware of any evidence that
25   Interstate Warehousing engaged in any activities in
```

1  which it attempted to convert the stored goods in its

2  warehouse to Interstate's own use?

3       A.    No.

4       Q.    And you're not saying that Interstate

5  Warehousing never inspected the roof prior to the

6  collapse, correct?

7       A.    Correct.  They knew what was going on.

8  They knew it was dangerous.  They were concerned about

9  the snow.  They were concerned about collapse, but

10  they simply didn't know what to do.

11       Q.    So it's your summary then that Interstate

12  just didn't know what to do and didn't take quick

13  enough corrective action?

14       A.    Yes.

15       Q.    Have you, at any time during your work on a

16  warehouse facility, ever retained a structural

17  engineer or outside engineer to calculate snow loads

18  for you?

19       A.    We tell property managers that when we are

20  asked those questions.  We tell them to consult with

21  an engineer immediately.

22       Q.    Has your company ever retained a structural

23  engineer or other expert to calculate snow-load

24  situations for a client?

25       A.    No.

```
 1          Q.   Did you consult with any other individuals
 2   whom you consider to be experts in certain disciplines
 3   or fields in preparing your report in this case?
 4          A.   No, I didn't consult any experts.
 5          Q.   Have you at any time ever observed daily
 6   operations of a warehouse facility like the one
 7   involved in the Hudsonville accident as far as snow
 8   removal operations and observations?
 9          A.   Well, we perform snow removal at hundreds
10   and hundreds of facilities every year, over 500.  So I
11   have seen snow removal operations performed, yes.
12          Q.   On rooftops?
13          A.   On a rooftop.  I have watched snow removal
14   off of many, many rooftops, yes.
15          Q.   And have you ever personally engaged in
16   those activities?
17          A.   No.  Our company had been a part of two
18   different instances, but -- and then we get called in
19   to work with the roofers when the roofers are throwing
20   all the snow off the roofs and removing it.  Then we
21   remove it once it hits the ground.
22          Q.   So your company's primary activity in those
23   situations would be to act as the snow removal
24   company, in other words, take the quantity of snow
25   that's down on the ground and haul it away?
```

```
1            A.    Yes.

2            Q.    Have you at any time ever personally

3     observed anyone at a warehouse facility engage in the

4     actual removal of the snow on the roof or cleaning of

5     drains on the roof for snow and ice melt-off?

6            A.    I have seen roofers removing snow off of

7     commercial buildings many, many times, and I didn't

8     really pay attention as to whether or not it was a

9     refrigerated warehouse.

10           Q.    And when you would watch these activities

11    of snow removal off the roof, were you actually up on

12    the rooftop or were you down below, ground level?

13           A.    I was at ground level.

14           Q.    So you've never been up on the roof making

15    those observations, correct?

16           A.    Correct.

17           Q.    And when you had these instances of the

18    other folks taking the snow off the roof and putting

19    it down on the ground so your company could remove it,

20    what devices were the folks using to remove the snow?

21           A.    Usually there's hand -- there's workers up

22    there that have tarps that they put snow into tarps

23    and drag tarps to the edge or they have what they call

24    snow sleds where they put snow onto sleds and pull

25    them to the edge and dump them over.  Sometimes I've
```

```
 1   seen -- they use a crane.  They'll have a sky crane
 2   that we'll put up, usually a big tarp.  And then
 3   they'll lift it up with a tarp and bring it down.
 4   Those are the primary ways.
 5        Q.   And when they use the tarps or the snow
 6   sleds or the cranes with the tarps, do they actually
 7   have the tarps or the sleds resting on the rooftop as
 8   they put the snow in it?
 9        A.   Yes.
10        Q.   With respect to the FEMA document that
11   you've utilized and referenced throughout your report,
12   are there any cautionary items in the FEMA document
13   saying that mechanical devices should not be used on
14   the rooftop for snow removal operations?
15        A.   The report was very extensive.  I don't
16   recall if -- I don't think they got into the real
17   specifics of that.
18        Q.   With respect to your report that you
19   prepared, what is before you as Exhibit 1, how many
20   drafts of that report did you prepare?
21        A.   I believe this was the only one.
22        Q.   And you didn't make any revisions to it?
23        A.   No.
24        Q.   Do you know when the warehouse up at
25   Hudsonville, Michigan, was built?
```

```
 1          A.    I don't.  I don't recall.  It may have in
 2   the case files, but I don't remember.  I know there
 3   were two phases.
 4          Q.    With respect to the winter conditions that
 5   existed up at Hudsonville, had Hudsonville, Michigan,
 6   ever experienced similar snow amounts in the period of
 7   time that the warehouse had been in existence prior to
 8   the collapse?
 9               MR. MCGOVERN:  Objection, foundation.  Go
10   ahead.
11          A.    I didn't research all of the previous snow
12   years, but I do know that the year of the collapse was
13   a particularly heavy snow year.
14          Q.    (By Mr. Gaston)  But you don't know how
15   that year compared to other previous years as far as
16   snow amounts?
17          A.    No.  Just that in the case files, the
18   manager -- it was the most amount of snow he had ever
19   seen on the roof since he had been working there.
20          Q.    But as far as comparing meteorologic data
21   for 2014 to other years, you didn't do that?
22          A.    No.
23          Q.    To your knowledge, had the Hudsonville
24   warehouse facility involved in this lawsuit ever had a
25   snow overload or roof collapse issue prior to March of
```

```
 1   2014?
 2          A.    Not that I'm aware of.
 3          Q.    You're not a licensed attorney, correct?
 4          A.    Correct.
 5          Q.    So as far as using legal terms or legal
 6   terminology in your report, you're not an expert in
 7   those terms, correct?
 8          A.    Correct.
 9          Q.    Would it be fair to say that based upon
10   your review of the information in this case not only
11   did Interstate Warehousing have verbal policies
12   regarding observations of the roof and cleaning of
13   drains, but that Interstate Warehousing made attempts
14   to comply with those observation policies and drain
15   cleaning policies prior to the roof collapse in
16   question?
17          MR. MCGOVERN:    Objection, vague.
18          A.    I believe they did initially as the winter
19   was going on, but then there was -- it became a period
20   where the snow depth and the melting and refreezing
21   and the ice was so deep that there was a concern.    It
22   was windy.    There were reports that it was windy up
23   there.    They were afraid to send people up there
24   because of wind gusts and because of the snow load.
25   And so at that point, it seems to me that they kind of
```

 1 | abandoned their policies.
 2 |     Q.   Isn't it fact, though, that Mr. Nate
 3 | Tippman, whose deposition you've read, testified that
 4 | in February and March -- and this incident happened on
 5 | March 8th -- that in February and March Mr. Tippman
 6 | personally went up on the roof to make observations
 7 | regarding conditions?
 8 |     A.   We did.  And then he was concerned and
 9 | didn't let anybody else go up there, was what I saw.
10 |     Q.   But this was not a situation where it
11 | became January and Interstate just stopped sending
12 | people up there to make observations and let things
13 | happen as they would?  They continued to make
14 | observations in February and March prior to the
15 | collapse, correct?
16 |     A.   Yes.
17 |     Q.   And Mr. Tippman also made an effort to try
18 | to assess snow-load issues by collecting a sample and
19 | trying to consult with structural engineer regarding
20 | the snow-load weights, correct?
21 |         MR. MCGOVERN:  I'll object.  It misstates
22 | the testimony of Mr. Tippman, but go ahead.
23 |     A.   Well, I do know that he was concerned and
24 | made an effort to weigh snow himself, and just the
25 | fact that he was that concerned -- I mean, to me,

 1 | there was urgency that should have happened with
 2 | getting a report back and there was a lack of urgency
 3 | to remove the snow before the collapse, is my opinion.
 4 |      Q.  (By Mr. Gaston)  But it's also true, is it
 5 | not, that Mr. Tippman did engage a professional
 6 | engineer, structural engineer, to research snow-load
 7 | issues and provide assessment for Interstate
 8 | Warehousing prior to the collapse occurring?
 9 |      MR. MCGOVERN:  I object to the
10 | mischaracterization of Mr. Tippman's testimony.
11 |      A.  I am aware that a consultant -- that he
12 | did -- he did reach out to an engineer.
13 |      Q.  (By Mr. Gaston)  With respect to the FEMA
14 | booklet that you've cited extensively in your report,
15 | I think it's called the Snow Load Safety Guide.  Would
16 | you agree?
17 |      A.  Yes.
18 |      Q.  And isn't it true that this FEMA booklet
19 | we're talking about is not a statutory law or
20 | federally enacted regulation?
21 |      A.  That's correct.
22 |      Q.  And what it is, is it's an information
23 | guide or information source, correct?
24 |      A.  Yes.
25 |      Q.  And it's for consideration and use by

```
 1   property owners, correct?
 2        A.   Yes.
 3        Q.   And isn't it true, sir, that even FEMA says
 4   at the beginning of this booklet that you should not
 5   rely on the accuracy, completeness or the usefulness
 6   of the information in this booklet?
 7        A.   That's a standard disclaimer, yes.
 8        Q.   That's in this booklet, though, correct?
 9             MR. MCGOVERN:   I object.   It states what it
10   states, Counsel.
11        A.   Yes.
12        Q.   (By Mr. Gaston)   And you relied on the FEMA
13   booklet for a number of your opinions in this case,
14   correct?
15        A.   I provided that because it just shows that
16   there's a lot of information that's available on snow
17   rooftop collapse and snow removal of rooftops, that it
18   is possible.   There are many different types of
19   documents and that's just one.
20        Q.   But you extensively cite the FEMA booklet
21   for opinions in this case, correct?
22        A.   Yes.
23        Q.   Isn't it also true that the FEMA booklet
24   also said that it's not intended to provide a
25   comprehensive discussion of the underlying issues or
```

```
 1   forensic of snow-induced structural failures?
 2              MR. MCGOVERN:  Same objection.
 3        A.    That's true; it does say that.
 4        Q.    (By Mr. Gaston)  And isn't it also true
 5   that this FEMA document also says that it's not to be
 6   a commentary on existing building codes, nor a
 7   guidance manual on how to compute snow loads?
 8              MR. MCGOVERN:  Same objection.
 9        A.    Yes.
10        Q.    (By Mr. Gaston)  And it's also not intended
11   to be a technical reference for the design of building
12   structural roof systems, correct?
13        A.    Yes.
14              MR. MCGOVERN:  Same objection.
15        Q.    (By Mr. Gaston)  And isn't it also true
16   that in the section of this FEMA guide talking about
17   method of snow removal, it expressly says, Do not use
18   mechanical snow removal equipment; is that correct?
19              MR. MCGOVERN:  Same objection.
20        A.    Yes.
21        Q.    (By Mr. Gaston)  Isn't it true, sir, that
22   the evidence you reviewed in this case, especially the
23   deposition of Mr. Tippman, indicated that Mr. Tippman
24   did not want to endanger any employees up on a roof
25   and chose to keep them away from any safety risk,
```