# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

ASPEN AMERICAN INSURANCE CO.,   )
as subrogee of Eastern Fish Company,   )
   )
      Plaintiff,   )
   )
v.   )   Case No. 1:14-CV-383
   )
INTERSTATE WAREHOUSING, INC.,   )
   )
      Defendant.   )

## OPINION AND ORDER

This matter is before the Court on cross-motions for partial summary judgment.

Defendant Interstate Warehousing filed its "Motion for Partial Summary Judgment as to the

Enforceability of the Limitation of Liability Contract Clause and Plaintiff's Spoliation of

Evidence Claims" on August 29, 2018 (ECF 35), to which Plaintiff Aspen American Insurance

filed a response on October 29, 2018 (ECF 42) and Interstate filed a reply on December 12, 2018

(ECF 48). Aspen filed its motion for partial summary judgment on October 29, 2018 (ECF 40),

to which Interstate filed a response on December 26, 2018 (ECF 51) and Aspen filed a reply on

January 9, 2019 (ECF 53). For the reasons explained below, Defendant Interstate's motion is

GRANTED in part and DENIED in part, and Plaintiff Aspen's motion is DENIED.[1]

### I. Background

Interstate Warehousing owns and operates "cold storage warehouses throughout the

United States." Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment

---

[1] Also before the Court is Defendant Interstate's Request for Oral Argument (ECF 50), to which Aspen did not respond. The Court concludes that the pending motions can be resolved on the briefs and supporting evidence and that oral argument is not necessary. The Request for Oral Argument is DENIED.

(ECF 41), p. 1. Eastern Fish Company sells and distributes frozen seafood and contracted to store some of its products–about $2.5 million worth–in Interstate's cold-storage warehouse in Hudsonville, Michigan. *Id*., pp. 1-2. The frozen seafood was then distributed to grocery stores for sale to consumers. *Id*., p. 1. On March 8, 2014, part of the roof of Interstate's Hudsonville warehouse collapsed due to heavy snow, "subjecting the temperature-sensitive products within the Warehouse to temperature damage." *Id*., p. 2. After the roof collapse "[t]he Michigan Department of Agriculture seized [Eastern Fish's inventory] from Interstate." *Id*. Aspen states that "[weeks later, Interstate hired a contractor to haul the Food Products away and have them disposed [of] so that Interstate could satisfy its own obligations to the government related to the seizure of the Food Products." *Id*., p. 3. Aspen "paid Eastern Fish for [its] loss in return for subrogation rights." *Id*. Aspen brought this suit to recoup its money, contending that the loss of Eastern Fish's products was Interstate's fault. Aspen contends that Interstate knew or should have known that the warehouse in Hudsonville was structurally unable to handle the weight of excessive snow and therefore Interstate should be made to pay the loss incurred by Eastern Fish as a result of what Aspen alleges was a preventable incident. Interstate, however, insists that "Eastern Fish . . . and Defendant entered into a warehouse contract and rate quotation . . . which contained a standard, industry-wide used, liability and limitation of damages provision . . . which limits the liability for damages claimed in Plaintiff's Complaint to approximately $128,400, if Defendant is found legally liable." Defendant's Memorandum in Support of Motion for Partial Summary Judgment (ECF 36), p. 1. Interstate also insists that the roof collapse was the result of an "Act of God, occurring without the fault of Interstate." Defendant's Response in Opposition (ECF 51), p. 8.

Interstate argues that the limitation of damages provision included in its contract with Eastern Fish is valid and enforceable, and the company seeks summary judgment on that issue. *Id*. Interstate also seeks summary judgment on Aspen's "claims of spoliation of evidence and intentional spoliation of evidence [because they] are not recognized independent causes of action under either Indiana or Michigan laws[.]" *Id*.[2] Aspen argues that Interstate cannot limit its liability because the actions of its employees and agents before and after the roof collapse constituted "breach of bailment, conversion and gross negligence." Plaintiff's Memorandum in Support (ECF 41), p. 3. Aspen maintains it is entitled to judgment as a matter of law on those three claims and that the Court should award Plaintiff more than $2.6 million for the loss of its food products, nearly $8 million in treble damages, and several hundred thousand more in prejudgment interest, costs and attorneys' fees. *Id*., pp. 24-25.

## II. Summary judgment standard

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the

---

[2] The parties agree that Michigan law applies to this case, as discussed below.

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). "[Speculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

As the Seventh Circuit has explained many times and reiterated recently, a district court's task on summary judgment is as follows:

> The following common refrains in summary judgment cases are important to recall in a case with so many factual recitations:
>
> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a

trial. Summary judgment is not appropriate if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party. We must look
therefore at the evidence as a jury might, construing the record in the light most
favorable to the nonmovant and avoiding the temptation to decide which party's
version of the facts is more likely true. As we have said many times, summary
judgment cannot be used to resolve swearing contests between litigants.

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne*

*v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

### III. Discussion

### A. Choice of law

When the parties filed their cross-motions for summary judgment they had not yet agreed

whether Michigan or Indiana law applied to this case. The case is before this Court on diversity

jurisdiction because Plaintiff Aspen "is a Texas corporation with its principal place of business

located in Rocky Hill, Connecticut . . . [and] Defendant, Interstate, is an Indiana corporation with

a principal place of business in Fort Wayne, Indiana." Plaintiff's Memorandum in Support, p. 3.

However, the events giving rise to this lawsuit occurred at Interstate's warehouse in Hudsonville,

Michigan. In its brief in support of its motion for partial summary judgment, filed on August 29,

2018, Interstate stated that "[i]t has yet to be determined whether Michigan or Indiana law will

apply to the facts of this matter[]" but added that "Defendant asserts that Michigan law

applies[.]" Defendant's Memorandum in Support, p. 1. At that point, Interstate presented its

arguments "under Michigan and Indiana law." *Id.*, p. 2. Aspen, in its memorandum in support of

its own motion for partial summary judgment filed on October 29, 2018, also argued that

Michigan law applies. Plaintiff's Memorandum in Support, pp. 12-15. By the time Interstate filed

its reply brief in support of its motion on December 12, 2018, the parties apparently had

concluded and agreed that Michigan law applies, since Interstate discusses only Michigan law in that brief. Defendant's Reply Brief (ECF 48). The final round of briefs, including Defendant's Response in Opposition (ECF 51) filed on December 26, 2018, and Plaintiff's Reply in Support (ECF 53) filed on January 9, 2019, apply and discuss *only* Michigan law. The Court agrees and will apply Michigan law for the reason argued by the parties. *See* Defendant's Memorandum in Support, pp. 1-2 ("Michigan law applies because it is the state with the most intimate contacts to the facts and location of the alleged property damage"); Plaintiff's Memorandum in Support, p. 15 ("The place of all of the wrongs complained of, including the final destruction of the Food Products . . . occurred in Michigan."). As this Court has noted, it is well established that in a diversity case, "Indiana's choice of law rules determine the applicable state law. . . . The general rule for torts is that the law of the state where the injury occurred controls." *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 498-99 (N.D. Ind. 2014) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (forum state's choice of law rules determine the applicable law in diversity cases)). In this case, Michigan law applies to Aspen's tort claims "since the injury has a significant connection to that state." *Agricultural Mgmt. Dev., Inc. v. Nat'l City Bank*, 2003 WL 21919184, at *1 (N.D. Ind. June 23, 2003) (citing *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001); also citing *Judge v. Pilot Oil Corp.*, 205 F.3d 335 (7th Cir. 2000) (under Indiana's choice of law rules the law of the state where the injury occurred governs)).

**B. Cross-motions for partial summary judgment–factual assertions and arguments**

To reiterate, Interstate moves for summary judgment on the issue of the enforceability of the limitation of damages provision in its contract with Eastern Fish and also seeks "judgment in

its favor . . . as a matter of law[]" as to Aspen's "claims of spoliation of evidence and intentional spoliation of evidence [because they] are not recognized independent causes of action under either Indiana or Michigan laws[.]" Defendant's Memorandum in Support, p. 2. Interstate insists there are no material disputes about the contractual language or that spoliation allegations cannot be brought as independent causes of action and so Interstate is entitled to judgment as a matter of law on both issues. Aspen, in its motion, moves for judgment (including an award of damages as noted above) on its Michigan state law claims for "breach of bailment, conversion and gross negligence." Plaintiff's Memorandum in Support, p. 3.

While Interstate's arguments are primarily legal ones, Aspen's are much more fact-dependent. Interstate wrote in its motion for oral argument that "the claims and facts at issue in the parties' respective motions for partial summary judgment largely coincide[.]" It might be more accurate to say that the issues are intertwined or interdependent, in that Interstate argues that the limitation of liability provision trumps Aspen's damages claim and the Act of God defense trumps Aspen's claims for breach of bailment, conversion and gross negligence (because an event that occurs due to an Act of God *ipso facto* does not involve negligence–or any fault at all–on the part of an alleged tortfeasor), while Aspen argues that the evidence establishes as a matter of law that Interstate was grossly negligent, which trumps Interstate's Act of God defense and its limitation of liability argument.

Aspen's Complaint alleges 10 claims or "counts" against Interstate, including 1) breach of contract, 2) negligent bailment, 3) negligence, 4) gross negligence, 5) spoliation of evidence, 6) intentional spoliation of evidence, 7) fraudulent concealment, 8) conversion, 9) consumer fraud, and 10) breach of bailment. Amended Complaint (ECF 3), pp. 3-14. All of those claims

7

are based on Aspen's allegations that Interstate was negligent–grossly negligent, in fact–in not preventing the roof collapse at its warehouse. The factual foundation for all of Aspen's claims is summarized in the following excerpts the Complaint:

> [D]efendant breached its duties and obligations under the agreement of the parties, and breached its obligations as bailee of the food products, in one or more of the following ways:
>
> (a) Failing to deliver the food products to Eastern in good order and condition;
>
> (b) Failing to take reasonable measures to prevent a roof collapse on the premises;
>
> © Failure to take reasonable measures to safeguard the food products while in its care, custody and control; and
>
> (d) Otherwise failed to perform pursuant to the agreement of the parties.

*Id.*, p. 14 ("Count X (Bailment)"). In Count IV, in which it alleges gross negligence, Aspen asserts that Interstate "willfully, wantonly and recklessly breached its duty to properly store, care for and protect Eastern's food products from damage by exhibiting utter indifference to or conscious disregard for the welfare of the Eastern's [sic] food products in defendant's care, custody and control." *Id.*, p. 6. All of Aspen's claims, then, are based on the premise that Interstate failed to prevent the roof collapse and destroyed evidence after the incident.

Aspen's argument centers on the actions of the warehouse general manager Nate Tippmann, who "was responsible for maintenance at the Warehouse[]" and Leroy Lozada, whom "Tippmann hired . . . to work as the maintenance technician and supervisor in 2012." Plaintiff's Memorandum in Support, pp. 4-5.[3] Aspen asserts that neither Tippmann nor Lozada had any "background in structural engineering or snow loads on steel roofs of commercial properties."

---

[3] For the sake of brevity and clarity, Aspen's internal citations to evidence, including the depositions of Tippmann and Lozada, have been omitted.

*Id*., p. 5. Either "Tippmann, Mr. Lozada or temporary maintenance employees would inspect the roof of the Warehouse on a monthly basis." *Id*. Interstate had "no written procedures regarding snow removal from the roof of the Warehouse[]" and "had no plans or policies with respect to snow events or snow removal." *Id*. And Aspen asserts that "Tippmann never asked a structural engineer whether it would be appropriate to remove snow from the roof of the Warehouse under certain circumstances[]" and "never received any instruction or training with respect to removal of snow accumulation on the roof of the Warehouse." *Id*. On February 20, 2014, "Tippmann notified Andrew Bobay, Corporate Engineer in charge of all Interstate warehouses, Matthew Helbling, Senior Vice President of Operations for Interstate, and Jeff Carteaux, Nate Tippmann's direct supervisor[]" about an excessive amount of snow on the Warehouse roof. *Id*., pp. 5-6. In an email to Bobay, Tippmann wrote as follows:

> Andy,
>
> We are at 26 inches of compressed snow with the bottom 6 inches being ice and slush (drifts along the walls are about 4 feet deep). How does this compare to our roof design spec? Are we still okay?

*Id*. The day after Tippmann's email to Bobay, "Interstate's management, including the president of the company, participated in a conference call" to discuss the issue. *Id*. From that point, "Tippmann and . . . Lozada continued to look for signs of structural strain in the coming weeks[]" and "provided each other with verbal reports of the snow accumulation and condition of the Warehouse roof." *Id*., p. 9. Aspen also asserts that "between February and March of 2014, Interstate never hired a snow removal company to inspect the snow load on the Warehouse roof to determine if snow and ice could be removed[]" and "never hired any contractor whatever to examine the structure related to the snow and ice accumulation." *Id*. The partial roof collapse

occurred on March 8.

Aspen's claims for conversion and spoliation of evidence are based on Interstate's post-collapse actions. Interstate informed Eastern Fish of the roof collapse and "[i]n a letter dated March 13, 2014, Eastern Fish provided Interstate with notice of its claim for damage to the Food Products with an estimated value of $2,411,273.00. Jeff Hastings, the treasurer of Interstate, responded with a letter the next day in which he declared that "[a]s this was an Act of God, we have no responsibility for your loss." *Id.*, p. 11.

The Michigan Department of Agriculture inspected the warehouse on the day of the collapse and issued a Notice of Seizure, directing that food products stored in the warehouse be destroyed due to "[possible adulteration of foods exposed to anhydrous ammonia leaking from damaged refrigeration equipment which was caused by a roof collapse." MDA Notice of Seizure (ECF 41-21). A few days later, on March 11, the Ottawa County (Michigan) Department of Public Health sent a letter to Interstate's director of operations stating that the food products in the area of the roof collapse, including Eastern Fish's products, were "deemed unsafe for human consumption." Ottawa Cty. Dept. of Health letter (ECF 41-22). The Department mandated that Interstate "[r]emove, and properly dispose of, all food under the [Michigan Dept. of Agriculture] seizure order at the site." *Id.* Accordingly, Interstate "sent the Food Products to Waste Management for destruction so Interstate could satisfy its obligations to the Michigan Department of Agriculture and the Department of Public Health for Ottawa County, Michigan." Plaintiff's Memorandum in Support, p. 11.

Aspen states that "Eastern Fish could not access the Food Products from the date of the Roof Collapse to the date of disposal by Interstate[]" and that "Eastern Fish did not authorize

Interstate to dispose of the Food Products." *Id*. Meanwhile, Aspen insists, Interstate committed acts of spoliation. Aspen asserts as follows:

> Aspen engaged a structural engineer, James Goes, to investigate the Roof Collapse. Mr. Goes visited the Warehouse on March 20, 2014, but Interstate did not allow Mr. Goes to move anything that could allow an examination of the point of failure of the roof. On March 20, 2014, Aspen and Eastern Fish (via counsel) advised Interstate that Interstate must preserve evidence related to the Roof Collapse and allow Aspen and Eastern Fish to investigate the loss or Interstate would face consequences for spoliation of evidence. Mr. Goes then coordinated with Nate Tippmann to investigate the Roof Collapse and arrived at the Warehouse on March 25, 2014, but Mr. Goes could not access the facility. Mr. Goes visited the Warehouse again on April 7, 2014. Interstate had removed the end wall, all product and racking.

*Id*., pp. 11-12. Goes apparently scheduled another visit to the warehouse for April 24, 2014, but according to Aspen much of the collapsed part of the warehouse had been removed:

> When we arrived approximately forty feet of the middle of the building was gone including the columns, joist girders, joists, roof deck, roofing material, mechanical systems, and any other materials that were on the roof. More importantly, the damaged parts of the collapsed roof were also gone. There was no structural debris on site. All of it had been hauled away.

*Id*., p. 12. Aspen contends that "Interstate destroyed all evidence related to the Roof Collapse with full knowledge that plaintiff sought to inspect it." *Id*. Interstate insists that Aspen is misstating, omitting and even misrepresenting certain facts. Interstate insists that its employees and agents did nothing wrong and, in fact, acted reasonably under the circumstances until an unprecedented snowfall–an Act of God–foiled their efforts. While many of the underlying facts concerning the actions or non-action of Interstate employees are not in dispute, Interstate insists that there are "significant and genuine disputes as to *what the material facts establish*[.]" Defendant's Response in Opposition (ECF 51), p. 7 (italics added).

### C. Interstate's motion for partial summary judgment

#### 1. Limitation of damages clause

Interstate argues that Aspen's claim for damages, exceeding $3 million not including

treble damages, "wholly ignores the Limitation Clause contained within the Warehouse

Contract[.] . . . However, Plaintiff is bound by the terms of the [contract] entered into by its

insured, Eastern, and Defendant, because a subrogee stands in the same position as its insured."

Plaintiff's Memorandum in Support, p. 6. Interstate insists that "[t]he undisputed evidence in this

case shows that Eastern and Defendant entered into the Warehouse Contract in April of 2013,

that the Warehouse Contract contained a Limitation Clause, . . . that Eastern stored food product

in Defendant's Hudsonville warehouse under the Warehouse Contract, and that Eastern had

approximately 256,000 pounds of food product contaminated as a result of the roof collapse. . . .

Therefore, under subpart (4) of the Limitation Clause, Defendant's potential total liability to

Plaintiff would be $128,400, assuming *arguendo*, Defendant is found to have acted negligently."

*Id.*, p. 7.

The limitation clause in the contract between Interstate and Eastern Fish states as follows:

> IN THE EVENT OF LOSS, DAMAGE OR DESTRUCTION TO STORED
> GOODS FOR WHICH COMPANY [Interstate] IS LEGALLY LIABLE,
> STORER [Eastern Fish] DECLARES THAT COMPANY'S LIABILITY SHALL
> BE LIMITED TO THE LESSER OF THE FOLLOWING: (1) THE ACTUAL
> COST TO STORER OF REPLACING OR REPRODUCING THE LOST,
> DAMAGED AND/OR DESTROYED GOODS TOGETHER WITH
> TRANSPORTATION COSTS TO WAREHOUSE, (2) THE FAIR MARKET
> VALUE OF THE LOST, DAMAGED AND/OR DESTROYED GOODS ON
> THE DATE THE STORER IS NOTIFIED OF LOSS, DAMAGE OR
> DESTRUCTION, (3) 50 TIMES THE MONTHLY STORAGE CHARGE
> APPLICABLE TO THE LOST, DAMAGED AND/OR DESTROYED GOODS,
> (4) $.50 PER POUND FOR THE LOST, DAMAGED AND/OR DESTROYED
> GOODS; PROVIDED, HOWEVER, THAT STORER MAY, UPON WRITTEN

REQUEST, INCREASE COMPANY'S LIABILITY ON PART OR ALL OF THE GOODS STORED UNDER THIS CONTRACT, IN WHICH CASE AN INCREASED CHARGE WILL BE MADE UPON SUCH INCREASED VALUATION; FURTHER PROVIDED THAT NO SUCH REQUEST SHALL BE VALID UNLESS MADE BEFORE LOSS, DAMAGE OR DESTRUCTION TO ANY POTION OF THE GOODS HAS OCCURRED.

Amended Complaint, Exh. B (Warehousing Contract). Interstate maintains the clause is enforceable under the circumstances and that it is entitled to judgment as a matter of law on the issue. Aspen responds by arguing that Interstate was grossly negligent, for the reasons already set forth in detail above, which nullifies the limitation clause (or at least creates "questions of material fact regarding whether defendant can limit its liability[]"). Plaintiff's Response in Opposition, p. 1. The Court agrees with Aspen. To understand why Interstate is not entitled to summary judgment on the limitation of liability issue, it is necessary to turn the focus to the issue of gross negligence as presented in Aspen's motion for partial summary judgment (a result of the aforementioned intertwined or interdependent nature of the issues).

Interstate concedes that "pursuant to Michigan common law, contractual provisions that limit liability do not apply to gross negligence[]" and states that it "does not contest [Aspen's] recitation or understanding of Michigan common law with respect to the non-application of limitation of liability provisions in cases of gross negligence[.]" Defendant's Reply in Support (ECF 48), p. 6. In other words, Interstate concedes that it cannot limit its liability under the contract if its own gross negligence was the proximate cause of the loss of Eastern Fish's products. Nonetheless, Interstate insists that Aspen has it all wrong on the underlying facts and that the actions of Interstate's employees before and after the roof collapse demonstrate a good faith effort to deal with a potential problem, as well as their inability to do anything following an

historic amount of snowfall (i.e., the Act of God). Interstate claims that Aspen "makes purported statements of material fact that are not supported by the evidence, are gross misstatements of the evidence and/or testimony in this matter, or are simply false[.]" Defendant's Response in Opposition (ECF 51), p. 3. Notwithstanding those objections, Interstate also states that "[d]espite the various inconsistencies and omissions of [Aspen] described above, [Aspen's] statement of material facts is largely consistent with [Interstate's] understanding of the material facts in this matter. However, there remain significant and genuine disputes as to what the material facts establish, and [Interstate] contends that [Aspen] is not entitled to summary judgment on its claims of breach of bailment, conversion, and/or gross negligence." *Id.*, p. 7.

For example, Interstate challenges Aspen's assertion that Interstate had no plans, policies or procedures regarding snow removal at the warehouse. Interstate "objects to this statement because it clearly misstates the evidence[.]" *Id.*, p. 3. Interstate contends that Aspen's factual assertion misrepresents the deposition testimony of Nate Tippmann in that "Mr. Tippmann, in reality, stated that Interstate did not have *formal* written policies and/or programs in place regarding snow event response or snow removal. . . . However, earlier in the same deposition, Mr. Tippmann described the *informal* verbal snow removal policies, those being that warehouse personnel would routinely remove snow from around the opening of the scuppers (drains) and drainage paths when the accumulation would exceed an estimated ten (10) inches." *Id.*, p. 4.

Interstate also argues that Aspen "fails to recognize that during winter months, Hudsonville, Michigan, and thus, the subject warehouse, had historically received great amounts of lake effect snow. In fact, Hudsonville . . . had seen over forty . . . inches of snowfall in a single month approximately seven . . . times in the seventeen . . . years preceding the subject accident,

through which the subject warehouse existed unaffected." *Id*. Interstate notes that Aspen's assertion that Interstate was grossly negligent regarding the accumulation of snow on the warehouse roof ignores the fact that "during the subject winter of 2013/2014, Hudsonville, Michigan, experienced one of the highest snowfalls on record, receiving 34.7, 41.9, and 29 inches of snowfall in the months of December, January, and February, respectively. During the months of January and February 2014, alone, more than 70 inches of snow fell in Hudsonville with an additional three inches of snow falling in the week leading up to the collapse. . . . Therefore, due to the unusual amount of snowfall during the winter of 2013/2014, Interstate determined that the loss was occasioned by an Act of God, and issued a letter to Eastern [Fish] stating such on March 14, 2014." *Id*., pp. 4-5.

Interstate also insists that Aspen's factual recitation "leads the Court to believe that no one [at Interstate] inspected up close the steel joists that ultimately failed after becoming concerned of the snow load on the warehouse roof and before the collapse. . . . However, [Aspen] conveniently fails to disclose that, on February 24, 2014, Andy Bobay, corporate engineer for Interstate, inspected the steel joists that ultimately failed up close using a scissor lift[]" and "indicated that he did not see any deflection or waviness in the steel joists at that time. Thereafter, Nate Tippmann and Leroy Lozada continued to look for signs of structural strain." *Id*., pp. 5-6. Interstate argues that these facts demonstrate that it attempted to deal with the snow accumulation issue–and that those attempts were for naught due to an Act of God. Therefore, Interstate argues, its actions leading up to the roof collapse were reasonable and not negligent, let alone grossly negligent.

Aspen's factual recitation, standing alone, is damning. Aspen contends that Interstate knew that the accumulating snow on the warehouse roof was a problem weeks before it collapsed but failed to take affirmative action to prevent it. However, Interstate's response in opposition to Aspen's motion not only fills in the back story but also supports Interstate's argument that "there remain significant and genuine disputes as to what the material facts establish." The facts giving rise to this case, in very large part, are either undisputed or undisputable. The actions of Tippmann, Lozada and other Interstate officers and employees both before and after the roof collapse are documented in deposition testimony, letters and emails. The overarching issue is whether those actions (or lack of action) constituted gross negligence. If so, the limitation of damages clause is nullified; if not, Aspen's recovery is limited to a fraction of the damages it seeks in this lawsuit. The issue of gross negligence, however, requires determination as to the reasonableness of Interstate's conduct under the circumstances–a quintessential jury inquiry since it requires weighing the evidence (and, to a slightly lesser extent, credibility determinations).

"[A] valid claim for gross negligence under Michigan law requires allegations of conduct 'akin to willful, wanton, or reckless misconduct.'" *Fletcher v. Bradford*, 2018 WL 5961044, at *7 (W.D. Mich. Nov. 14, 2018) (quoting *Reilly v. Vadlamudi*, 680 F.3d 617, 628 (6th Cir. 2012)). A Michigan appellate court summarized the law as follows:

> "Gross negligence" is defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). "Evidence of ordinary negligence is not enough to establish a material question of fact regarding whether a government employee was grossly negligent." *Chelsea Investment Group LLC v. Chelsea*, 288 Mich.App. 239, 265, 792 N.W.2d 781 (2010). Moreover, "[s]imply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Tarlea v. Crabtree*, 263 Mich.App. 80, 90, 687 N.W.2d 333 (2004). This is true of

"the most exacting standard of conduct, the negligence standard," and even truer of the "much less demanding standard of care," gross negligence. *Id.* The latter suggests "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Id.* Although questions regarding whether a [defendant's] conduct constituted gross negligence are generally questions of fact for the jury, if reasonable minds could not differ, summary disposition may be granted. *Briggs v. Oakland Co.*, 276 Mich.App. 369, 374, 742 N.W.2d 136 (2007).

*Wood v. City of Detroit*, 917 N.W.2d 709, 714 (Mich. App. 2018). And a federal district court sitting in Michigan explained as follows:

Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). It is an "almost ... willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v. Crabtree*, 263 Mich.App. 80, 687 N.W.2d 333, 339 (2004). Whether gross negligence occurred is "generally an issue of fact"; summary judgment should be granted only "where reasonable minds could not differ." *Schack v. City of Taylor*, 177 Fed.Appx. 469, 474 (6th Cir. 2006) (citing *Tarlea*, 687 N.W.2d at 339).

*Smith v. Twp. of Prairieville*, 194 F.Supp.3d 658, 674-75 (W.D. Mich. 2016). Gross negligence requires willful or wanton conduct on the part of the defendant. This is a high standard, as the Michigan Court of Appeals recently explained:

Wanton and willful misconduct has been described as:

[C]onduct that is either willful—i.e., intentional, or its effective equivalent. [W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does. [*Jennings v. Southwood*, 446 Mich. 125, 140; 521 N.W.2d 230 (1994) (quotation marks and citation omitted).]

A three-part test is used to determine if conduct is wanton and willful:

(1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.

*Rott v. Rott*, 2018 WL 6625162, at *2 (Mich. App. 2018). "Stated another way, gross negligence may be characterized by 'a willful disregard of safety measures and a singular disregard for substantial risks.'" *Schaub by Next Friend Schaub v. Seyler*, 2018 WL 6017973, at *5 (Mich. App. 2018) (quoting *Bellinger v. Kram*, 904 N.W.2d 870, 873 (Mich. App. 2017)). It is important to note, though, that "*[t]ypically, allegations of inaction or claims that a defendant could have taken additional precautions do not establish gross negligence.*" *Id.* (italics added); *see also*, *Greenia by Greenia v. Pfeiffer*, 2017 WL 5013360, at *3-4 (Mich. App. 2017) ("Moreover, '[s]imply alleging that an actor could have done more is insufficient under Michigan law, because with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result.' *Tarlea*, 263 Mich. App. at 90. '[S]aying that a defendant could have taken additional precautions is insufficient to find ordinary negligence, much less recklessness. Even the most exacting standard of conduct, the negligence standard, does not require one to exhaust every conceivable precaution to be considered not negligent.' *Id.*").

Interstate insists it was not negligent, let alone grossly negligent, in the way it handled the situation with the warehouse roof. In addition, Interstate argues that in the end its efforts were thwarted by an Act of God. A Michigan appellate court explained the "act of God" defense as follows:

> Michigan law recognizes the affirmative defense of "act of God." *See Golden & Boter Transfer Co v. Brown & Sehler Co.*, 209 Mich. 503, 510, 177 NW 202, 204 (1920). Our Supreme Court has described an "act of God" as: "[T]hose events and accidents which proceed from natural causes and cannot be anticipated and provided against, such as unprecedented storms, or freshets, lightning, earthquakes, etc." *Id.* This Court later added the following comments about the "act of God" defense: "the definition of an 'act of God' requires an unusual, extraordinary, and unexpected manifestation of the forces of nature, and require(s)

the entire exclusion of human agency from the cause of the injury or loss." *Potter v. Battle Creek Gas Co.*, 29 Mich.App 71, 75, 185 NW2d 37 (1970) (citing *Golden & Boter Transfer Co.*, supra); *Kaminski v. The Hertz Corp.*, 94 Mich.App 356; 288 NW2d 426 (1979).

*RVP Dev. Corp. v. Furness Golf Const. Inc.*, 2004 WL 1737589, at *1-2 (Mich. App. 2004). The

Court in *RVP* noted that "'when an act of defendant concurs with an act of God as a cause of the

injury, defendant is liable; that an act of God is a defense only if it is the sole proximate cause of

the injury.'" *Id*. (quoting *Smith v. Board of County Road Commissioners of Chippewa County*,

161 N.W.2d 561, 562 (Mich. 1968)). In the present case, whether an Act of God was the sole

proximate cause of the injury underlying this lawsuit is for a jury to decide, since Interstate's

affirmative defense is intertwined with the issue of its alleged gross negligence.

Genuine issues of material fact preclude a finding that the limitation clause is enforceable

as a matter of law. Fact issues exist concerning the reasonableness of Interstate's actions, i.e.,

whether they constituted gross negligence, and so Interstate is not entitled to summary judgment

on the issue of its ability to limit its liability. It bears repeating that "[o]n summary judgment a

court may not make credibility determinations, weigh the evidence, or decide which inferences to

draw from the facts; these are jobs for a factfinder. . . . [the court must] look therefore at the

evidence as a jury might, construing the record in the light most favorable to the nonmovant and

avoiding the temptation to decide which party's version of the facts is more likely true." *Johnson

v. Advocate Health*, 892 F.3d at 893 (quoting *Payne v. Pauley*, 337 F.3d at 770).

Since the issue of the limitation clause is inextricably intertwined with the issue of the

reasonableness of Interstate's conduct (i.e., the gross negligence issue), neither can be decided as

a matter of law on summary judgment. A jury must decide the issue of the reasonableness of

Interstate's actions and consider its Act of God defense, which precludes summary judgment as to the issue of whether Interstate can limit its liability. Accordingly, Interstate's motion for partial summary judgment on the issue of the applicability of the limitation clause is denied.

## 2. Spoliation claims

Interstate also argues that it is entitled to summary judgment on Aspen's spoliation claims, Counts V and VI of the Amended Complaint. Interstate, while "strongly maintain[ing] that it did not engage in spoliation of evidence,"[4] argues that the claims fail as a matter of law for the fundamental reason that they are not recognized causes of action. Interstate writes as follows:

> Plaintiff asserts independent claims of spoliation of evidence and intentional spoliation of evidence. . . . However, spoliation is not a recognized cause of action under Indiana law or Michigan law. See *Teel v. Meredith*, 774 N.W.2d 527 (Mich. App. 2009); *Gribben v. Wal-Mart Stores, Inc.*, 824 N.E.2d 349 (Ind. 2005). Rather, Michigan and Indiana appellate courts have emphasized their trial courts' authority to sanction a culpable party for spoliation and thus have relied on existing remedies to address events of spoliation of evidence by a party. See *Brenner v. Kolk*, 573 N.W.2d 65 (Mich. App. 1997); *Gribben* at 354.
>
> . . .
>
> Defendant submits that Plaintiff's allegations of spoliation are properly the subject of a motion seeking a negative inference as to certain evidence in this case should the matter proceed to trial. Thus, given the controlling law in both Michigan and Indiana, Defendant is entitled to judgment in its favor as a matter of law with respect to Plaintiff's independent spoliation of evidence claims.

Defendant's Memorandum in Support, pp. 7-8.

Interstate's argument is correct–Aspen cannot bring *independent causes of action* for

---

[4] Interstate insists that Aspen "was provided with, and took advantage of, numerous opportunities to inspect the post-collapse warehouse premises." Defendant's Memorandum in Support, p. 8. Any factual disputes about the spoliation issue are irrelevant now, however, since the issue is not before the Court on the merits of Aspen's allegations. The only issue before the Court is whether those allegations can form the basis for independent causes of action.

spoliation under either Michigan or Indiana law (or Sixth Circuit or Seventh Circuit law). "[I]t is well-established that neither Michigan nor federal law permit independent causes of action arising out of an alleged spoliation of evidence." *Dye v. City of Roseville*, 2014 WL 7184460, at *8 (E.D. Mich. Dec. 16, 2014) (citing *Bailey v. Trust Logistics*, 2014 WL 1317502, at *3 (E.D. Mich. 2014)); *also citing Cummerlander v. Patriot Preparatory Academy*, 2013 WL 5969727 (S.D. Ohio 2013) ("there is no free-standing tort claim for spoliation under federal common law."); *Panich v. Iron Wood Products Corp.*, 179 Mich. App. 136, 445 N.W.2d 795 (1989) ("The tort of spoliation is not available in Michigan."); *Gill v. Locricchio*, 2006 WL 891463 (E.D. Mich. 2006) ("Michigan law does not recognize spoliation and destruction of evidence as a cause of action.").

Indiana law is the same, as this Court has explained: "'Spoliation is not an independent tort in Indiana, but Indiana law does allow courts to fashion remedies for spoliation[.]'" *Napier v. Louis Dreyfus Co. LDAI Holdings, LLC*, 2018 WL 5016336, at *4 (N.D. Ind. Oct. 15, 2018) (quoting *Bonilla v. Rexon Indus. Corp.*, 2015 WL 10792026, at *10 (S.D. Ind. Aug. 19, 2015) (applying Indiana law on spoliation in context of summary judgment in diversity case)). Michigan law similarly provides for sanctions against the offending party but not an independent cause of action. As the state court explained in *Teel*:

> When a party destroys or loses material evidence, whether intentionally or unintentionally, and the other party is unfairly prejudiced because it is unable to challenge or respond to the evidence, a trial court has the inherent authority to sanction the culpable party to preserve the fairness and integrity of the judicial system. *Brenner v. Kolk*, 226 Mich.App. 149, 160, 573 N.W.2d 65 (1997). There is also a general rule that if a party intentionally destroys evidence that is relevant to a case, a presumption arises that the evidence would have been adverse to that party's case. *Ward v. Consolidated Rail Corp.*, 472 Mich. 77, 84, 693 N.W.2d 366 (2005).

*Teel v. Meredith*, 774 N.W.2d 527, 531, 284 Mich. App. 660, 666-67 (2009).

Aspen responds to Interstate's motion by insisting that the evidence Aspen has submitted on summary judgment "has proven that defendant spoliated key evidence, the very structure of the Warehouse following the roof collapse, despite direct written notice from plaintiff of its demand to inspect the structure." Plaintiff's Response in Opposition, p. 3. Aspen contends that Interstate "denied plaintiff's structural engineer access to examine the Warehouse following the collapse[.] Plaintiff's structural engineer could not determine the cause of the roof collapse because defendant had destroyed the evidence." *Id*., p. 20 (citing Exh. 21, p. 17, "We do not have enough evidence to come to a conclusion at this point."); Exh. 25, p. 2, "There are likely other contributing factors that caused the roof failure, but we will not be able to determine these factors as all evidence of the failure is lost."). Aspen then proceeds to discuss federal law regarding spoliation as explained by the Sixth Circuit and district courts sitting in Michigan. *Id*. This reliance on Sixth Circuit law might be misplaced, as discussed below. In any event, Aspen contends that Interstate destroyed or allowed to be destroyed the structural parts of the Warehouse that collapsed, and that an appropriate sanction would be for this Court to deny Interstate's motion for partial summary judgment. In short, Aspen wants the Court to find that Interstate committed spoliation *as a matter of law* and sanction it for that conduct.

What Aspen does *not* do in its response brief is defend its ability to bring independent causes of action for spoliation. Instead, Aspen states that trial courts "may 'impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed

evidence.'" Plaintiff's Response in Opposition, p. 20 (quoting *Coach, Inc. v. Dequindre Plaza, LLC*, 2013 WL 2152038, *6 (E.D. Mich. May 16, 2013)). This is an accurate representation of the law, but it misses the point. Aspen doesn't address the viability of its spoliation "claims," arguing instead that it "is entitled to an adverse inference due to defendant's spoliation of the evidence related to the collapse. As a sanction, defendant's motion for partial summary judgment should be denied and defendant should be prohibited from seeking limitation of liability." *Id.*, pp. 20-21. In other words, Aspen does not argue that it can bring independent causes of action for spoliation, choosing instead to insist it has *proven* spoliation and the Court should deny Interstate's motion for summary judgment as a sanction. This argument misses the mark since the issue of whether Interstate committed spoliation of evidence is *not* before the Court. The issue before the Court is whether Aspen can maintain *independent causes of action* for spoliation (it cannot), not whether Interstate *committed* spoliation or what sort of sanction should be imposed if it did. The Court grants Interstate's motion for that reason–Aspen cannot maintain independent causes of action for spoliation. At the end of the day, this might be a Pyrrhic victory for Interstate, since the *issue* of spoliation survives even though Aspen's *causes of action* for spoliation perish.[5]

There is a secondary issue here that warrants discussion. As stated above, when presenting its arguments concerning spoliation Aspen relied on the federal law of the Sixth Circuit. Plaintiff's Response in Opposition, p. 20. This is likely because one of the cases on

---

[5] As Interstate notes in its reply brief, "the 'severity [of a spoliation sanction] should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality.'" Defendant's Reply in Support, p. 13 (quoting *Adkins v. Wolever*, 692 F.3d at 504).

which Aspen relies is *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009), in which the Sixth

Circuit, overruling circuit precedent, held that spoliation sanctions are governed by federal law.

The Sixth Circuit concluded as follows:

> In contrast to our persistent application of state law in this area, other circuits
> apply federal law for spoliation sanctions. *See, e.g., Silvestri v. Gen. Motors
> Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *Reilly v. Natwest Mkts. Group Inc.*, 181
> F.3d 253, 267 (2d Cir. 1999); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.
> 1993). We believe that this is the correct view for two reasons. First, the authority
> to impose sanctions for spoliated evidence arises not from substantive law but,
> rather, "from a court's inherent power to control the judicial process." *Silvestri*,
> 271 F.3d at 590 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S.Ct.
> 2123, 115 L.Ed.2d 27 (1991)). Second, a spoliation ruling is evidentiary in nature
> and federal courts generally apply their own evidentiary rules in both federal
> question and diversity matters. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir.
> 2003). These reasons persuade us now to acknowledge the district court's broad
> discretion in crafting a proper sanction for spoliation.

*Adkins v. Wolever*, 554 F.3d at 652. But while Michigan state law applies to the substantive

claims and Michigan is in the Sixth Circuit, this case was filed in Indiana on the basis of

diversity jurisdiction, which changes the calculus. As this Court explained in *Napier*:

> Before I address this specific issue, however, I must lay out the basics of
> spoliation under Indiana law. Napier points me to *Coates v. Johnson & Johnson*,
> 756 F.2d 524, 551 (7th Cir. 1985) to argue that the "prevailing rule" on spoliation
> is that bad faith destruction of evidence gives rise to a "strong inference" that the
> evidence "would have been unfavorable to the party responsible for its
> destruction." . . . Coates is a federal civil rights case under Title VII alleging racial
> discrimination in employment. ***The case before me is a diversity of citizenship
> case, so state and not federal law governs the issue of spoliation.*** *Allstate Ins.
> Co. v. Sunbeam Corp.*, 53 F.3d 804, 806 (7th Cir. 1995); *ArcelorMittal Indiana
> Harbor LLC v. Amex Nooter, LLC*, 2018 WL 509890, at *1 (N.D. Ind. Jan. 23,
> 2018) ("duty to preserve pre-suit evidence is governed by Indiana state law, not
> federal law"); *Bonilla v. Rexon Indus. Corp.*, 2015 WL 10792026, at *10 (S.D.
> Ind. Aug. 19, 2015) (applying Indiana law on spoliation in context of summary
> judgment in diversity case). As such, Coates is inapposite.

*Napier v. Louis Dreyfus Co.*, 2018 WL 5016336, at *4 (emphasis added). And finally, Seventh

Circuit law regarding spoliation provides for the same remedies, as this Court has explained:

> "The Court has discretion to sanction a party for spoliation of evidence." *Bryant v. Gardner*, 587 F.Supp.2d 951, 967-68 (N.D. Ill. Nov. 21, 2008) (citation omitted); *see also ChampionsWorld, LLC v. U.S. Soccer Fed'n*, 276 F.R.D. 577, 582 (N.D. Ill. Aug. 17, 2011) (citation omitted). "Sanctions [for spoliation of evidence] include awarding reasonable expenses, attorney fees, barring evidence or arguments, permitting adverse inferences, and dismissing claims or entering default judgment." *Bryant*, 587 F.Supp.2d at 968 (citations omitted); *see Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010) ("In order to draw an inference that the missing documents contained information adverse to the defendants, [the plaintiff] must demonstrate that the defendants intentionally destroyed the documents in bad faith." (citations omitted)).

*Norwood v. E. Allen Cty. Schools*, 2018 WL 4680008, at *7 (N.D. Ind. Sept. 28, 2018).

Aspen correctly represents the Sixth Circuit's holding in *Adkins*, but its application of Sixth Circuit law to the issue of spoliation is likely in error and Indiana law would apply in this case. Interstate does not jump into this choice of law question, resting on its premise that Aspen cannot maintain independent claims for spoliation under regardless of jurisdiction.

In the end, this Court's conclusion is the same whether the issue is analyzed under Indiana law, Michigan law, Sixth Circuit law, or Seventh Circuit law. Aspen's claims of spoliation and intentional spoliation are not cognizable as independent causes of action regardless of the jurisdiction. The allegations that Interstate destroyed evidence, even if accepted as true, do not entitle Aspen to assert causes of action for spoliation. That said, the granting of Interstate's motion for summary judgment does not preclude Aspen from pursuing the issue of whether Interstate spoliated evidence. All this Court's ruling does is to preclude Aspen from bringing independent causes of action or "claims" for spoliation, not from pursuing sanctions for the alleged destruction of evidence. Accordingly, Interstate's motion for partial summary judgment is granted as to Aspen's claims for spoliation (Count V) and intentional spoliation

(Count VI).

### D. Aspen's motion for partial summary judgment

As stated above, Aspen seeks judgment as a matter of law on three of its 10 claims against Interstate–breach of bailment, gross negligence and conversion. As the Court also stated above, Aspen's motion must be denied for the same reasons Interstate's motion on the issue of the limitation clause was denied, which is that a jury must determine the reasonableness of Interstate's conduct both before and after the roof collapse. That overarching issue, which can only be resolved by a jury after it assesses testimony and weighs all the evidence, precludes granting summary judgment on Aspen's claims.

### 1. Gross negligence

Aspen bases its claims on its contention that Interstate knew about the danger created by the accumulating snow and failed to take any action to prevent the roof collapse, which Aspen says constitutes gross negligence. Interstate insists it acted prudently in light of the circumstances, that its warehouse had endured 17 Michigan winters without a roof collapse, and that Eastern Fish's food was destroyed by an Act of God. The Court has already ruled on this issue above, holding that the issue of Interstate's alleged gross negligence is a jury question. Therefore, Aspen's motion for partial summary judgment on the issue of gross negligence must be denied for the same reasons Interstate's motion for summary judgment on the limitation clause issue was denied.

It bears repeating that "[o]n summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. . . . [the court must] look therefore at the evidence as a jury might,

construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d at 893 (quoting *Payne v. Pauley*, 337 F.3d at 770). The issue of Interstate's alleged gross negligence must be determined by a jury and Aspen's motion for partial summary judgment is denied.

### 2. Breach of bailment

Aspen also seeks summary judgment on its claim for breach of bailment. A federal district court sitting in Michigan recently summarized Michigan law on breach of bailment, explaining as follows:

> A bailment exists when a bailor delivers personal property to a bailee "in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished." *Goldman v. Phantom Freight, Inc.*, 162 Mich. App. 472, 479-80 (1987). To establish a prima facie case of negligence on behalf of the bailee, the bailor must establish the existence of a bailment and that the property is returned in a damaged condition, thus creating a presumption of negligence. *Columbus Jack Corp v. Swedish Crucible Steel Corp.*, 393 Mich. 478, 483-484 (1975). The bailee may rebut that presumption by proving that the bailee exercised due care under the circumstances. *Id*. at 486.

*Strong v. Passport Auto Logistics, LLC*, 2018 WL 352891, at *4 (E.D. Mich. Jan. 10, 2018). Aspen argues that since its insured's food products were delivered to Interstate in good and sellable condition, and were then destroyed while in Interstate's custody, Aspen has established a *prima facie* claim for breach of bailment. Plaintiff's Memorandum in Support, p. 15.

Interstate responds by arguing that it "has produced evidence of the actual circumstances surrounding the collapse and the undisputed evidence in this matters shows that the collapse was an Act of God, occurring without the fault of Interstate. Therefore, any presumption of

negligence on the part of Interstate has been adequately rebutted." Defendant's Response in Opposition, p. 8. Whether the presumption has been "adequately rebutted" so as to defeat Aspen's breach of bailment claim is for a jury to decide, since it involves the same material issues regarding the reasonableness of Interstate's conduct. For purposes of summary judgment, the rebuttal is "adequate" in that it raises a material fact issue as to Interstate's liability. Interstate summarizes its argument as follows:

> [Aspen] is not entitled to summary judgment on its claim of breach of bailment because [Interstate] has overcome the presumption of negligence by producing evidence of the actual circumstances of the collapse. Such evidence indicates that [Interstate] acted as a reasonably careful warehouse operator would have acted under similar circumstances, and that the subject collapse was occasioned by an Act of God and that the event occurred without the fault of [Interstate]. Further, at the very least, the designated evidence creates a question of fact for the jury as to whether the presumption has been refuted.

*Id*., p. 10. Interstate is correct that a jury must decide Aspen's breach of bailment of claim since it embraces the same material issues that preclude summary judgment on the parties' other claims (and requires a weighing of the evidence). For these reasons, Aspen's motion for partial summary judgment on its claim for breach of bailment is denied.

### 3. Conversion

Aspen moves for summary judgment on its conversion claim. Aspen notes that "Michigan law allows for both common law and statutory conversion . . . [and] defines common law conversion as 'any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'" Plaintiff's Memorandum in Support, p. 13 (citing *Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 871 N.W.2d 136, 144 (Mich. 2015)). Aspen explains that "[s]tatutory conversion under Michigan law requires a

showing of common law conversion, with the added showing of conversion 'to the other person's own use.'" *Id.* (citing *Aroma*, 871 N.W.2d at 138; MCL 600.2919a).[6] Aspen argues that Interstate is liable for either or both common law or statutory conversion because it disposed of Aspen's food products without Aspen's authority (common law conversion) and used them to satisfy Interstate's "own use," i.e., satisfying the mandates of the Michigan Dept. of Agriculture and the Ottawa County Dept. of Health (statutory conversion). The argument is a bit convoluted, beginning with its foundation, which Aspen states as follows:

> Interstate never had the right to subject the Food Products to ammonia and temperature damage. Interstate never had the right to deny Eastern Fish access to the Food Products. Interstate never had the right to allow a third-party to seize the Food Products. Interstate never had the right to destroy the Food Products. Interstate only had the right to store the Food Products and return them to Eastern Fish when directed to do so.

*Id.*, p. 18. In other words, because the food products were destroyed while in Interstate's custody, "Interstate's conduct was 'inconsistent with the owner's [Aspen's] property rights[,]'" *id.* (quoting *Aroma*, 871 N.W.2d at 145), and "[t]herefore, plaintiff has established that Interstate is liable for common law conversion of the Food Products." *Id.*, p. 19.

Furthermore, argues Aspen, "Interstate intentionally caused the destruction of the Food Products to satisfy its obligations to the state of Michigan and local government under the Notice of Seizure." *Id.*, p. 20. Aspen insists that in doing so, Interstate not only converted the food products under common law, but also converted them to its "own use" to "satisfy their obligation to the governmental authorities by having the Food Products destroyed." *Id.*, p. 21.

---

[6] The Michigan conversion statute is the basis for Aspen's treble damages claim. Aspen states that "pursuant to MCL 600.2919a, a plaintiff can recover '3 times the amount of actual damages sustained, plus costs and reasonable attorney fees' for statutory conversion claims." Plaintiff's Memorandum in Support, p. 14.

In support of its conversion claim, Aspen relies exclusively on *Aroma Wines*, which Aspen insists is "an analogous action." *Id*., p. 16. In *Aroma*, the plaintiff wine distributor contracted to store wine at the defendant's temperature-controlled warehouse. The plaintiff fell behind on payments so the defendant asserted lien rights over the wine. The defendant then moved the wine to an area that was not temperature-controlled so it could renovate the area where the wine was previously stored. The move rendered the wine unfit for sale and the plaintiff sued the defendant for conversion (among other claims). The case ended up at the Michigan Supreme Court, which held that the defendant's act of moving the wine for purposes of renovating part of its warehouse satisfied the "own use" requirement and therefore constituted statutory conversion.

Aspen insists that by destroying Eastern Fish's products to fulfill legal duties imposed on it by governmental entities, Interstate converted the products to its "own use," just as the defendant in *Aroma Wines* did. The only way this argument could be a winning one is if Aspen had authority to support its implied contention that the notices from Michigan state and county authorities *directing* Interstate to destroy the food products are irrelevant to the analysis. Unlike the defendant in *Aroma*, who made a deliberate choice to move the plaintiff's wine to accommodate defendant's warehouse renovation project, Interstate was mandated by the Michigan Department of Agriculture and the Ottawa County Department of Health to destroy Eastern Fish's seafood after determining that it was potentially contaminated as a result of the roof collapse. Interstate distinguishes *Aroma Wines* from the present case as follows:

> In *Aroma Wines*, the defendant moved wine from a temperature-controlled storage area to an uncontrolled storage area, thereby destroying the wine, in order to renovate its refrigerated storage area. . . . Therefore, it was the defendant's act of

moving the wine that destroyed the wine. . . . In the instant action, [Aspen] now argues that [Interstate] converted the Food Products "to its own use" when it disposed of the already destroyed Food Products[.] . . . Interstate's only remedy available to it under the law was to comply with the seizure notice. . . . Further, in the case at bar, Interstate's compliance with the [Michigan Dept. of Agriculture's] Notice of Seizure was not a conversion of the Food Products "to its own use." While [Aspen] attempts to confuse the Court by manipulating compliance with the Notice of Seizure to mean satisfying is "own obligations," [Aspen] fails to recognize that compliance was not a purpose personal to [Interstate's] interests.

Defendant's Response in Opposition, pp. 12-13. Interstate also argues that Aspen's conversion claims are based on a faulty premise. Interstate insists that "unlike the destruction of the wine in *Aroma Wines*, in the present matter, [Aspen's] loss for which it is now attempting to recover was not caused by [Interstate's] alleged acts of conversion (i.e., the disposal of the Food Products). . . . The Food Products were destroyed as a result of the roof collapse and the resulting Notice of Seizure . . . , not [Interstate's] disposal of the seized Food Products." Put another way, Interstate's argument is that Aspen is trying to fit a square peg into a round hole and all it the tort of conversion.

The Court, after "constru[ing] all facts in a light most favorable to the non-moving party and draw[ing] all reasonable inferences in favor of the non-moving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, concludes that Aspen has failed to establish as a matter of law that Interstate committed conversion. Aspen fails to cite any authority to support its argument that Interstate committed conversion when it destroyed the food products after being directed to do so by Michigan state and county authorities. And as Interstate points out, it was the roof collapse, not Interstate's compliance with agency orders, that was the proximate cause of the loss for which Aspen seeks to recover. For these reasons, Aspen's motion for summary judgment on its claim for conversion is denied.

**CONCLUSION**

For the reasons discussed above, Defendant Interstate's "Motion for Partial Summary Judgment as to the Enforceability of the Limitation of Liability Contract Clause and Plaintiff's Spoliation of Evidence Claims" (ECF 35) is GRANTED in part and DENIED in part; Plaintiff Aspen's motion for partial summary judgment (ECF 40) is DENIED; and Defendant Interstate's Request for Oral Argument (ECF 50) is DENIED.

Date: March 13, 2019.

 /s/   William C. Lee  
William C. Lee, Judge  
U.S. District Court  
Northern District of Indiana
