**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| ASPEN AMERICAN INSURANCE CO., ) | |
| as subrogee of Eastern Fish Company, ) | |
| ) | |
|       Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:14-CV-383 |
| ) | |
| INTERSTATE WAREHOUSING, INC., ) | |
| ) | |
|       Defendant. ) | |

### OPINION AND ORDER

This matter is before the Court on the Motion for Sanctions Based on Defendant's

Spoliation of Evidence filed by Plaintiff Aspen American Insurance Co. (ECF 64). Defendant

Interstate Warehousing, Inc., filed a response in opposition (ECF 67) and Aspen American filed a

reply (ECF 68). Also pending before the Court is a Motion to Strike Untimely Discovery

Responses filed by Aspen (ECF 70), to which Interstate filed a response in opposition (ECF 72)

and Aspen filed a reply (ECF 73). For the reasons explained below, the Motion for Sanctions is

GRANTED in part (as to the issue of spoliation of evidence) and DENIED in part (as to the

applicable sanction to be imposed), and the Motion to Strike is DENIED.

### I. Background

Interstate Warehousing owns and operates cold storage warehouses throughout the United

States, including one in Hudsonville, Michigan. Eastern Fish Company sells and distributes

frozen seafood and contracted to store some of its products–about $2.5 million worth–in

Interstate's warehouse in Hudsonville. The frozen seafood was then distributed to grocery stores

for sale to consumers. On March 8, 2014, part of the roof of Interstate's Hudsonville warehouse

collapsed following a heavy snow, and Eastern Fish's inventory was either destroyed or rendered unfit for sale to consumers. Aspen American, as Eastern Fish's insurer, paid Eastern Fish for the loss of its products in return for subrogation rights to pursue Interstate Warehousing. Aspen brought this suit to recoup its money, contending that the loss of its insured's products was Interstate's fault. Aspen contends that Interstate knew or should have known that the warehouse in Hudsonville was structurally unable to handle the weight of excessive snow and therefore Interstate should be made to pay the loss incurred by Eastern Fish as a result of what Aspen alleges was a preventable incident. Interstate insists that its contract with Eastern Fish included a limitation of damages provision that limits Interstate's liability, assuming it is determined to be liable, to $128,400.00. Interstate also insists that the roof collapse was the result of an act of God, occurring without the fault of Interstate, and so the company cannot be held liable for the loss.

The parties previously filed cross-motions for partial summary judgment. Interstate moved for summary judgment on the issue of the limitation of liability provision and the spoliation issue. Defendant's Motion for Partial Summary Judgment (ECF 35). Aspen American moved for summary judgment on the issue of liability and the issue of spoliation of evidence. Plaintiff's Motion for Partial Summary Judgment (ECF 40). In an Opinion and Order entered on March 13, 2019, the Court denied Interstate's motion as to the issue of limitation of liability, granted the motion as to the issue of spoliation of evidence, and denied Aspen American's motion in its entirety. Opinion and Order (ECF 56). The Court concluded that the issues of whether Interstate Warehousing is liable for Aspen American's loss and, if so, whether that liability is capped by the damage limitation provision in Interstate's contract with Eastern Fish, could not be resolved on summary judgment since they require a weighing of the evidence as

well as credibility determinations. The Court denied Aspen American's motion for summary judgment as to liability based on the same reasoning, i.e., that genuine issues of material fact require a trial on the issue of liability. The Court also denied Aspen American's motion as to the issue of spoliation, concluding (as Interstate had argued) that an allegation of spoliation of evidence cannot be the basis for an independent claim or cause of action. Instead, the spoliation issue had to be presented to the Court in a motion for sanctions. Accordingly, Aspen American filed the present motion, contending that Interstate committed spoliation of evidence by disposing of structural components (including support beams) of the warehouse at the site of the roof collapse. Aspen American moves the Court to impose sanctions against Interstate for the alleged spoliation.

## II. Standard of Review

The Court explained in its order on the motions for summary judgment that Indiana law governs the issue of spoliation in this diversity case and the parties agree. *See* Plaintiff's Memorandum in Support of Motion for Sanctions (ECF 65), p. 5 ("This matter is brought pursuant to the Court's diversity jurisdiction. Therefore, Interstate's duty to preserve evidence is governed by Indiana law."); Defendant's Response Brief in Opposition to Plaintiff's Motion for Sanctions (ECF 67), p. 6 ("Defendant agrees with Plaintiff and the Court that, because this matter is brought under this Court's diversity jurisdiction, the issue of spoliation of evidence in this matter is governed by Indiana law.").

"Spoliation is a particular discovery abuse that involves the intentional or negligent destruction, mutilation, alteration, or concealment of physical evidence." *N. Indiana Pub. Serv. Co. v. Aqua Envtl. Container Corp.*, 102 N.E.3d 290, 300 (Ind.Ct.App. 2018) (quoting *Popovich*

*v. Ind. Dep't of State Revenue*, 17 N.E.3d 405, 410 (Ind. Tax Ct. 2014)). "A party raising a claim of spoliation must prove that (1) there was a duty to preserve the evidence, and (2) the alleged spoliator either negligently or intentionally destroyed, mutilated, altered, or concealed the evidence." *Id.* (citing *Popovich*, 17 N.E.3d at 410; *Glotzbach v. Froman*, 854 N.E.2d 337, 338-39 (Ind. 2006) ("the duty to preserve evidence may be assumed voluntarily or imposed by statute, regulation, contract, or certain other circumstances.")). The Indiana Court of Appeals recently explained as follows:

> The party raising a claim of spoliation has the burden of proving that there was a duty to preserve the evidence on the part of the alleged spoliator. *Glotzbach v. Froman*, 854 N.E.2d 337, 338-39 (Ind. 2006) (noting that duty to preserve evidence may be assumed voluntarily or imposed by statute, regulation, contract, or other circumstances). The duty to preserve evidence occurs when a first-party claimant "knew, or at the very least, should have known, that litigation was possible, if not probable." *N. Ind. Pub. Serv. Co. v. Aqua Envt'l. Container Corp.*, 102 N.E.3d 290, 301 (Ind.Ct.App. 2018).

> "In Indiana, the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it." *Porter v. Irvin's Interstate Brick & Block Co., Inc.*, 691 N.E.2d 1363, 1364-1365 (Ind.Ct.App. 1998) (citing *Westervelt v. Nat'l Mfg. Co.*, 33 Ind.App. 18, 69 N.E. 169, 172 (1903)). This rule is typically applied "to a party which has suppressed evidence believed to be in its control at the time of the law suit." *Id.* at 1365. Like we held in *Porter*, "we see no reason why [this rule] should not be applied where the party spoliates evidence prior to the commencement of a law suit that the party knew or should have known was imminent." *Id.*

*Golden Corral Corp. v. Lenart*, 127 N.E.3d 1205, 1217-18 (Ind.Ct.App. 2019). And as this Court has explained:

> Under Indiana law, spoliation is defined as "'the intentional destruction, mutilation, alteration, or concealment of evidence.'" *Glotzbach v. Froman*, 854 N.E.2d 337, 338 (Ind. 2006) (quoting *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000) (quoting Black's Law Dictionary 1409 (7th ed. 1999))); see also *J.S.*

*Sweet Co., Inc. v. Sika Chem. Corp*., 400 F.3d 1028, 1032 (7th Cir. 2005) (citing *Cahoon*, 734 N.E.2d at 545); *WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 702 (Ind.Ct.App. 2014) (citing *Glotzbach*, 854 N.E.2d at 338). "Under Indiana law, a party may not lose, destroy or suppress material facts or evidence 'prior to the commencement of the lawsuit that the party knew or should have known was imminent.'" *Large*, 2008 WL 89897, at *7 (quoting *Porter v. Irvin's Interstate Brick & Block Co.*, 691 N.E.2d 1363, 1365 (Ind.Ct.App. 1998)[.]

*ArcelorMittal Indiana Harbor LLC v. Amex Nooter, LLC*, 2018 WL 509890, at *2 (N.D. Ind. Jan. 23, 2018).

If a court concludes that a party committed spoliation of evidence, it must determine what sanction, if any, should be imposed. On that point the Indiana Court of Appeals has explained as follows:

> As for sanctions if spoliation is found, our supreme court has noted that
>
>> [p]otent responses ... exist under Indiana Trial Rule 37(B) authorizing trial courts to respond to discovery violations with such sanctions "as are just" which may include, among others . . . dismissal of all or any part of an action. . . .
>
> *Id*. at 351. In *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182 (Ind. 2011), our supreme court quoted from a "widely cited opinion" about the factors weighing on the appropriate sanction:
>
>> Determining whether sanctions are warranted and, if so, what they should include, requires a court to consider both the spoliating party's culpability and the level of prejudice to the party seeking discovery. Culpability can range along a continuum from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation. Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof. A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice. Even if there is intentional destruction of potentially relevant evidence, if there is no prejudice to the opposing party, that influences the sanctions consequence. And even if there is an inadvertent loss of evidence but severe prejudice to the opposing party, that too will influence the appropriate response,

recognizing that sanctions (as opposed to other remedial steps) require some degree of culpability.

*Id*. at 189-90 (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F.Supp.2d 598, 613 (S.D.Tex. 2010)).

*WESCO Distribution, Inc. v. ArcelorMittal Indiana Harbor LLC*, 23 N.E.3d 682, 702-03 (Ind.Ct.App. 2014). Finally, while "spoliation of evidence permits a jury to 'infer that the missing evidence [is] unfavorable' to the party who intentionally destroyed evidence[,] . . . [t]he inference does not relieve [the movant] of proving their case." *Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 970-71 (Ind.Ct.App. 2013) (citations omitted).

## III. Discussion

As set forth above, a party can only be liable for spoliation of evidence if that party had a duty to preserve the evidence at issue. In the present case, the Court finds that Interstate had a duty to preserve the structural components of the warehouse at the point of the roof collapse. Interstate argues that Aspen American's letter addressing the preservation of evidence was "vague" and did not put Interstate on notice that parts of the warehouse structure itself had to be preserved. Interstate argues as follows:

Plaintiff's March 20, 2014[,] preservation of evidence letter primarily concerned the preservation and retention of documents and electronic data, and noted specifically with regards to physical building structure, "[t]his includes allowing access to the cargo and structure by Eastern or its agents." . . . Due to the vague nature of Plaintiff's preservation of evidence letter, which specifically requested access to the collapsed structure, Defendant was unaware that Plaintiff was demanding the preservation of the collapsed and damaged building structure itself.

Defendant's Brief in Opposition, pp. 7-8. Interstate then insists that because it afforded Aspen American's expert, James Goes, several opportunities to visit the site, it fully complied with Aspen American's preservation of evidence letter.

In its reply brief, Aspen American responds to Interstate's argument as follows:

> [Aspen American] did provide Interstate with notice to preserve evidence, and specifically evidence of the "structural failure." [Aspen American's] March 20, 2014[,] letter states: Please be advised that you are under a legal duty to maintain, preserve, retain, protect, and not destroy any and all evidence regarding the cargo loss, along with the structural failure. . . . Despite explicit language regarding preservation of the structural failure, some five years later, Interstate claims confusion regarding whether [Aspen American] demanded preservation of evidence related to the structural failure. . . . This argument is baseless. Interstate's legal duty, supplemented by [Aspen American's] preservation letter, leaves no doubt on whether Interstate had to preserve evidence of the structural failure.

Plaintiff's Reply Brief, p. 3 (citations to record omitted). Aspen American's preservation letter stated in relevant part as follows:

> Please be advised that you are under a legal duty to maintain, preserve, retain, protect, and not destroy any and all evidence regarding the cargo loss, along with the structural failure. This includes allowing access to the cargo and structure by Eastern or its agents. . . . The failure to preserve and retain the physical evidence and electronic data outlined in this notice may constitute spoliation of evidence which will subject you to legal claims for damages and/or evidentiary and monetary sanctions.

Plaintiff's Memorandum in Support (ECF 65), p. 3 (quoting Letter from Aspen American's counsel to Interstate Senior Vice President Brad Hastings).

The Court finds Interstate's arguments unavailing. Interstate had a duty to preserve evidence related to the roof collapse, including the structural components of the warehouse itself, and Aspen American's preservation letter was not vague or confusing on that point. Interstate is a sizeable and sophisticated business entity, which undermines its argument that it was unclear or unsure about its duty to preserve evidence in light of Aspen American's notice. As set forth above, the law requires a party to "not lose, destroy or suppress material facts or evidence prior to the commencement of the lawsuit that the party knew or should have known was imminent."

*ArcelorMittal Indiana Harbor LLC v. Amex Nooter, LLC*, 2018 WL 509890, * 2 (N.D. Ind. Jan. 23, 2018). Interstate does not dispute that it received Aspen American's notice of claim dated March 13, 2014, and Aspen's preservation letter dated March 20. The notice and preservation letter were sufficient to put Interstate on notice that it had a legal duty to preserve evidence related to the roof collapse, *including* the structural components of the building itself. Interstate's attempt to argue that the notice was "vague" or somehow did not alert Interstate to its duty to preserve those components is unconvincing. The Court finds that Interstate had a legal duty to preserve evidence of the structural failure.

The Court now turns to the substantive issue, which is whether Interstate committed spoliation of evidence with regard to the structural components of the warehouse and, if so, what sanctions, if any, should be imposed. In its motion for sanctions, Aspen American "moves this Court to sanction defendant, Interstate Warehousing, Inc., for its spoliation of evidence, and grant the following relief:

(1) That Interstate is barred from pursuing a contractual limitation of liability defense at trial;

(2) That Interstate is barred from pursuing an Act of God defense at trial;

(3) That Interstate is barred from cross-examination of plaintiff's expert witness, James Goes, at trial;

(4) That Interstate is barred from presenting any evidence of its inspection and maintenance of the warehouse roof prior to the roof collapse; and

(5) That the jury be informed of Interstate's destruction of evidence and instructed that it can draw a negative inference from the destruction of evidence."

Motion for Sanctions (ECF 64), pp. 1-2. In short, Aspen American is asking the Court to impose sanctions that would effectively quash Interstate's ability to present a defense to Aspen's claims. But Aspen American insists that the actions of Interstate leading up to and after the roof collapse resulted in the loss or destruction of crucial evidence and impeded Aspen American's ability to investigate and determine the cause of the collapse, and therefore Interstate should be subject to the severe sanctions Aspen seeks. Aspen American claims that Interstate committed spoliation of evidence that prevented Aspen American's expert, structural engineer James Goes, whom Aspen American "'engaged . . . 'to find the cause and origin of the roof collapse[,]'" from examining the collapsed part of the warehouse structure. Plaintiff's Memorandum in Support (ECF 65), p. 2 (quoting Letter from James Goes, April 18, 2014 (ECF 41-23), p.1)). Aspen American also states that "[o]n or after March 26, 2014, Interstate demolished the failed structure and hauled away all evidence of the structural failure." *Id.*

Aspen American claims that "Mr. Goes first visited the Warehouse on March 20, 2014. During that visit, Interstate did not permit Mr. Goes to move anything that would allow an examination of the point of failure of the roof. . . . The evidence of the Roof Collapse was still intact as of March 20, 2014." *Id.*, pp. 2-3 (including photograph of collapsed roof dated March 20, 2014). Also on March 20, 2014, Aspen American "provided written notice to Interstate by overnight mail. The notice advised Interstate to preserve evidence related to the roof collapse, and allow plaintiff to investigate, or Interstate would face consequences for spoliation of evidence." *Id.*, p. 3. Aspen American states that "Mr. Goes spoke with Nate Tippmann, General Manager of the Warehouse, following the March 20, 2014[,] notice provided to Interstate." *Id.* In Goes' letter dated April 18, 2014, he states the following:

LWG[1] has made three visits to the site. The first was March 20, 2014. We were allowed access to the warehouse only with supervision and for a short term because of the risk of product falling from the shelves as it thawed. LWG was not allowed to move or take anything because others had to see the failure. There was an issue with danger of further collapse. On March 24, LWG was informed that the owner was bringing in a demolition crew to knock down the building. We coordinated with Nate Tippmann that the wrecking crew would be on site the 24th and would start working on the 25th. Therefore, we planned to be on site to learn how they were going to perform their work to get information about the beams and joist that failed. We arrived after noon on the 25th and the wrecking crew had not even arrived on site, yet. We visited again on April 7. No one was allowed access because the corporate team would not allow anyone to access the site unless they were part of the wrecking crew.

On April 7, we arrived on site to find the end wall was removed, the product was gone, and the racks were torn out. Almost all of the building was cleared. There is concern that any relevant evidence might no longer be usable.

LWG arranged to visit the site on April 24, 2014. We specifically asked, if we would be allowed access. Nate Tippmann said yes. When we arrived approximately forty feet of the middle of the building was gone including the columns, joist girders, joists, roof deck, roofing material, mechanical systems, and any other materials that were on the roof. More importantly, the damaged parts of the collapsed roof were also gone. There was no structural debris on site. All of it had been hauled away.

Goes Letter (ECF 41-23), pp. 1-2. Goes' letter includes several photographs that he states provide "[a] chronology in pictures" depicting the damage from the roof collapse and the condition of the warehouse as of March 20, 2014, (*id*., pp. 2-6), as well as showing what the warehouse looked like on April 24, 2014, after the debris had been cleared and structural repairs had begun (*id*., pp. 6-16). Describing Goes's efforts to examine the site of the collapse, Aspen American states as follows:

At some point between March 26, 2014, and April 7, 2014, Interstate destroyed evidence related to the roof collapse:

---

[1] LWG is the name of the consulting company with which Goes is associated.

> "On April 7, we arrived on site to find the end wall was removed, the
> product was gone, and the racks were torn out. Almost all of the building
> was cleared. There is concern that any relevant evidence might no longer be
> usable."

Brief in Support, p. 3 (quoting Goes Letter (ECF 41-23), p. 2). Aspen American alleges that

"Goes made a final visit to determine if any evidence remained that could assist his investigation

of the cause and origin of the Roof Collapse. However, as Mr. Goes reported:

> LWG arranged to visit the site on April 24, 2014. . . . When we arrived
> approximately forty feet of the middle of the building was gone including the
> columns, joist girders, joists, roof deck, roofing material, mechanical systems, and
> any other materials that were on the roof. More importantly, the damaged parts of
> the collapsed roof were also gone. There was no structural debris on site. All of it
> had been hauled away.

*Id*., p. 4 (quoting Goes Letter, p. 4). Goes stated his findings and conclusions as follows:

> We do not believe that the snow caused the failure. Based on the limited area of
> the failure on the first visit, we believe the problem may be in the joist connection.
> Although, this opinion is based on extremely limited information and with very
> low certainty.
> . . .
>
> LWG Consulting hereby certifies that the expressed opinions and conclusions
> have been formulated within a reasonable degree of professional certainty. They
> are based upon all of the information known by LWG at the time this report was
> issued, as well as knowledge, skills, experience, training, and/or education.
>
> 1. We do not have enough evidence to come to a conclusion at this point.

Goes Letter, p. 17. Aspen American further asserts that:

> . . . Mr. Goes' findings and conclusions are uncontroverted. In this action,
> Interstate knew of plaintiff's arguments regarding spoliation of evidence from
> plaintiff's complaint. . . . Interstate never deposed Mr. Goes with respect to his
> report. Interstate has not identified any testifying expert witness that could refute
> Mr. Goes' report. In addition, Mr. Nate Tippmann of Interstate has no recollection
> of Mr. Goes' visits and discussions during the relevant period of time.

Brief in support, p. 5 (internal citations to record omitted). Based on this factual premise, Aspen

American argues that Interstate "had a duty to preserve evidence[,]" failed to do so and "destroyed evidence of the Roof Collapse[,]" and that this alleged "destruction of evidence severely prejudiced plaintiff's ability to prosecute its claims in this action." *Id.*, pp. 9-13. Aspen American argues that Interstate should be subject to severe sanctions for its alleged destruction of evidence.

Interstate responds by contending that Aspen American "conveniently ignores a number of relevant facts and issues in this case which show that Plaintiff's motion for sanctions has no merit. Specifically, Plaintiff ignored the fact that, after the roof collapse, Interstate was issued a directive from the Ottawa County [Michigan] Department of Public Health to '[e]liminate the harborage conditions that may have been created due to roof collapse' by March 24, 2014. Additionally, Plaintiff wholly failed to inform the Court that Interstate offered to allow Plaintiff, or its agents, to inspect the collapsed facility pursuant to a Hold Harmless Agreement acknowledging the remaining 'extremely hazardous conditions' created by the roof collapse. Finally, Plaintiff entirely overlooks Mr. Goes' additional opportunities to inspect the collapsed structure components prior to their disposal. All of the foregoing additional facts must be considered by this Court when determining whether it should impose sanctions on Defendant." Defendant's Response Brief in Opposition (ECF 67), p. 2. Interstate also argues that Aspen American "overestimates the amount of prejudice, if any, it suffered as a result [of] Interstate's disposal of the collapsed building materials pursuant to the directive issued by the Ottawa County Department of Public Health. Specifically, Plaintiff's argument that the collapsed building materials could have harbored evidence of Interstate's gross negligence is misguided and unsupported by basic logic. Therefore, . . . Interstate did not commit spoliation of evidence

and Plaintiff's Motion for Sanctions should be denied in its entirety." *Id.*, pp. 2-3.

Interstate's argument that it did not commit spoliation of any evidence is based largely on the premise that the actions it took after the collapse were necessary and even mandated by Michigan county and state agencies. Interstate explains as follows:

> On March 8, 2014, at approximately 2:00 a.m., a portion of Defendant's Hudsonville warehouse roof collapsed under the weight of record level snow and ice, causing an ammonia leak inside the warehouse facility and the surrounding area. A Hazmat team was dispatched to the warehouse to secure the ammonia leak and a structural engineer deemed the remaining portion of the warehouse "extremely hazardous." . . . In the overnight hours of March 9 to March 10, 2014, an additional area of the roof structure collapsed, leading structural engineer Ralph Den Hartigh to suggest Defendant continue to refrain from entering the unsafe premises. . . . On March 11, 2014, Defendant received notification from the Ottawa County Department of Public Health that the Michigan Department of Agriculture was requiring Defendant to remove and dispose of all contaminated food products and to eliminate the harborage conditions (i.e., the collapsed portion of the warehouse) by March 24, 2014.

*Id.*, p. 3 (internal citations to record omitted). Interstate also asserts that it notified Eastern Fish on March 13, 2014, "of the collapse and resulting loss of its product. On March 14, 2014, Plaintiff issued its notice of claim to Defendant. . . . On March 14, 2014, Defendant responded to Plaintiff's notice of claim and notified Plaintiff that the collapse and resulting loss was occasioned by an Act of God." *Id.*, pp. 3-4.

Interstate also takes issue with Aspen American's argument that its investigating expert, Goes, was denied sufficient access to the site. According to Interstate, it endeavored to ensure that Goes had opportunities to inspect the site, and points out that he did so on several occasions, which it recounts in its brief:

> On March 20, 2014, Mr. Goes visited the collapsed warehouse facility and was able to obtain photographs and perform a visual inspection. . . . Further, on March 20, 2014, Plaintiff provided a written preservation of evidence letter outlining the

evidence to be retained and preserved for inspection. Specifically, with respect to the preservation of the collapsed building structure, Plaintiff's notice stated "[t]his includes allowing access to the cargo and structure by Eastern or its agents." . . . Thereafter, Mr. Goes was informed that, in order to comply with Ottawa Department of Public Health's Order, demolition of the collapsed warehouse would begin on March 25, 2014.

. . .

Accordingly, on March 25, 2014, Mr. Goes again presented at the collapsed warehouse facility and learned that the demolition crew had not yet arrived and had not begun demolishing the remaining structure. . . . On March 26, 2014, Defendant provided further notice to Plaintiff that it would have until 5 p.m. Friday, March 28, 2014, to conduct an inspection of the subject warehouse before demolition began in order to comply with the Ottawa Department of Public Health Order.

. . .

On April 7, 2014, Mr. Goes again visited the warehouse site and found . . . that the demolition had been partially completed. . . . Mr. Goes, again, did not attempt to inspect the collapsed building materials that remained, and there is no evidence to suggest that Defendant would have precluded Mr. Goes from performing an inspection at that time if he had executed the Hold Harmless Agreement provided on March 26, 2014.

Lastly, Mr. Goes visited the warehouse site on April 24, 2014, and found that the relevant building materials had been removed in accordance with the Health Department's Order. . . . Thereafter, Mr. Goes authored his report stating that he was unable to determine the cause of the roof collapse. . . .

Defendant's Brief in Opposition, pp. 4-5 (internal citations to record omitted).

In its reply brief, Aspen American takes issue with Interstate's contention that Goes was permitted to examine the warehouse on several occasions. Aspen American argues that "James Goes was never allowed to examine critical components involved in the failure of the structure, despite his diligence. . . . Based on his limited observations, Mr. Goes opined that a joist connection could have caused or contributed to the structural failure." Plaintiff's Reply (ECF 68), p. 4. Aspen American also insists that "Interstate cannot hide behind the local government to

avoid the consequences for destruction of evidence. Interstate controlled every aspect of the post-collapse process. Interstate controlled access to the site [and] controlled the persons that it allowed to inspect the structural failure. . . . Interstate even controlled the date of the demolition of the structure, which occurred after the 'deadline' provided in the notice from the local government. Interstate could have and should have provided Mr. Goes with access to the critical structural components that failed." *Id.*, p. 7. Aspen American also takes issue with Interstate's argument that Aspen suffered no prejudice as a result of the destruction of the warehouse components. Aspen American argues as follows:

> Interstate argues [that] "it is highly likely that the subject collapsed building materials and joist connections would have provided inconclusive evidence. . . .' Interstate had the chance to make that determination and then destroyed the evidence after it reached a self-serving conclusion on its value. . . . The prejudice here is obvious: Interstate determined that an Act of God caused the roof collapse, but plaintiff never had a chance to reach its own conclusions.

*Id.*, p. 8 (quoting Interstate's response brief, p. 13).

So the battle lines are drawn. Aspen American argues that Interstate concluded immediately that the roof collapse was an Act of God, quickly sought to remove parts of the structure of the warehouse before Aspen American could examine them closely and thoroughly, and now waives around the notices from governmental entities to hide, or at least justify, their actions. Interstate, on other hand, argues that it afforded Goes several opportunities to inspect the site and that it was obligated to comply with the governmental notices regarding the clean-up of the damaged structure.

The Court concludes that Interstate committed spoliation of evidence in that parts of the structure of the warehouse were rendered unavailable to Aspen American's investigator, who

states that he was unable to reach a conclusion about the cause of the collapse because he had insufficient opportunity to inspect those structural components. The Court also concludes, however, that the spoliation of evidence in this instance was not a deliberate attempt by Interstate to squirrel away evidence in an effort to prevent Aspen American from conducting an inspection and investigation into the cause of the roof collapse. On the contrary, the evidence shows that Interstate made efforts to notify Aspen American of the roof collapse and the imminent removal of the destroyed food products and structural parts of the warehouse, and allowed Aspen American's investigator to visit and inspect the site on several occasions before the removal took place. Mr. Goes states that he was unable to observe or inspect the structural components of the warehouse sufficiently to make a determination about the cause of the collapse and Aspen American contends that as a result of the unavailability of that evidence it is entitled to the severe sanctions it seeks. And, while Aspen American contends that Interstate is attempting to justify its actions by hiding behind the directives from the Ottawa County Department of Public Health and the Michigan Department of Agriculture, the Court is mindful of the fact that Interstate was obligated to comply with those directives by removing the affected food products and the collapsed portions of the warehouse structure itself. Interstate was placed, to an extent, between a proverbial "rock and a hard place," having to clean up the site while also endeavoring to comply with Aspen American's demand that it not remove or destroy any evidence that might be relevant to determining the cause of the collapse (meaning, of course, actual structural components of the warehouse). In short, the Court concludes that Interstate committed spoliation in that parts of the warehouse that were under Interstate's exclusive control were ultimately rendered unavailable for a complete and thorough inspection by Aspen American's expert, but that Interstate's degree of

culpability does not rise to a level that would warrant imposition of the several severe sanctions Aspen American seeks. Therefore, the Court grants the motion for sanctions but declines to impose the sanctions Aspen American requests.

The Court has considered the parties' arguments and supporting evidence, and concludes that while Interstate committed spoliation of evidence, in that it rendered the structural components of the warehouse unavailable for adequate inspection by Aspen American, its degree of culpability is far less than Aspen American contends. As set forth above, a party's "degree of culpability" can range from intentional "destruction intended to make evidence unavailable" to "inadvertent loss of information." In this case, the totality of the circumstances indicate that Interstate's failure to preserve the structural components of the warehouse was not a deliberate attempt to suppress evidence. The Court concludes that Interstate's actions fall much closer to the negligent or inadvertent end of the "culpability continuum." Interstate provided Aspen American (through Mr. Goes) opportunities to inspect the site before any components were removed, but Goes maintains that he was unable to observe or inspect the parts closely enough to make a conclusive determination of the cause of the collapse. Interstate also informed Aspen American in advance that demolition crews were scheduled to remove the structural components from the site of the roof collapse in order to comply with the directive from Ottawa County.

The Court also finds that the "extent of prejudice" to Aspen American is less than it contends. While neither party knows what a thorough inspection of the structural components might have revealed with regard to the cause of the collapse, Aspen American's inability to conduct such an inspection does not result in "an inability to prove [its] claims." Aspen American alleges several claims against Interstate, including claims for negligence and gross

negligence. *See* Amended Complaint (ECF 3). Aspen American might arguably have had an easier time proving its claims–especially its gross negligence claim–if it had a sufficient opportunity to inspect the structural components, but a jury instruction regarding spoliation is sufficient to remedy that prejudice. Accordingly, while the Court grants the motion for sanctions, it declines to impose the extreme sanctions requested by Aspen American. The sanctions Aspen American seeks–including "[t]hat Interstate is barred from pursuing a contractual limitation of liability defense at trial; [t]hat Interstate is barred from pursuing an Act of God defense at trial; . . . [t]hat Interstate is barred from cross-examination of plaintiff's expert witness, James Goes, at trial; . . . [and] [t]hat Interstate is barred from presenting any evidence of its inspection and maintenance of the warehouse roof prior to the roof collapse[]"–are not justified under the circumstances. The Court will, however, impose one of the sanctions requested by Aspen American, which is that "the jury be informed of Interstate's destruction of evidence and instructed that it can draw a negative inference from the destruction of evidence."

For the reasons set forth above, the Court hereby grants the following relief to Aspen American:

1. The Court will provide a preliminary and final jury instruction that the jury may, but is not required to, conclude that evidence that might have been obtained from an inspection of the warehouse components removed from the site would have been unfavorable to Interstate.

2. The jury will be permitted to hear and consider evidence from both parties about Interstate's failure to preserve the structural components (or make them available for inspection) and how and to what degree Aspen American was prejudiced by Interstate's actions in that regard.

3. The Court reserves the right to alter the wording to, and supplement, the preliminary and final

jury instruction and to impose other sanctions for spoliation before or during trial, if appropriate.

**IV. Motion to strike**

The Court denies Aspen American's motion to strike. In that motion, Aspen American "moves this Court to strike untimely discovery responses served by . . . Interstate . . . on May 20, 2019." Plaintiff's Motion to Strike (ECF 70), p. 1. In support of the motion, Aspen American notes that the discovery phase in this case "closed on September 28, 2018." *Id*. Aspen argues that Interstate submitted supplemental discovery responses that should be stricken due to their untimely submission. Specifically, Aspen American argues as follows:

> On May 20, 2019, without leave of court, Interstate served plaintiff with *Defendant's Supplemental Responses to Plaintiff's Requests for Admission*. . . and *Defendant's Supplemental Responses to Plaintiff's Request for Documents* . . . , which plaintiff received by mail on May 23, 2019. Interstate's service of untimely amended discovery responses, including production of documents that were never previously disclosed, violates Rules 36(b) and 37(c)(1) of the Federal Rules o Civil Procedure. Therefore, Interstate's untimely discovery responses should be stricken.

*Id*. (italics in original). The discovery responses that Aspen American challenges include 1) an email from structural engineer Ralph Den Hartigh, (ECF 67-1); 2) an affidavit of Nate Tippmann (ECF 67-3); Exhibit A attached to Tippmann's affidavit; and Exhibit B attached to Tippmann's affidavit. Aspen American contends that "the untimely discovery must have been available to Interstate for over five years, but Interstate chose not to disclose the information or seek discovery related to the information in the untimely responses." Plaintiff's Memorandum in Support of Motion to Strike (ECF 71), p. 4.

The discovery responses that Aspen American wants stricken include an email sent on March 10, 2014, from Ralph Den Hartigh, an engineer who inspected the site of the roof collapse

on that date, in which he opines that the part of the warehouse where the roof collapsed was potentially dangerous and should be avoided "until a determination can be made as to the building's condition." Aspen American challenges Nate Tippmann's affidavit on the grounds that it, and the two exhibits attached to it, are untimely. Exhibit A of the Tippmann affidavit is a purported "visitor log" indicating that certain insurance adjustors and other individuals (including agents or representatives of Eastern Fish) visited the site of the damaged warehouse between March 14 and March 21 of 2014. Exhibit B of the Tippmann affidavit is a copy of a letter sent from Tippmann to Aspen American's counsel on April 18, 2014, in which Tippmann summarizes the dates and times that James Goes was present to observe or inspect the site of the roof collapse.

In response, Interstate argues that the challenged discovery material should not be stricken because Aspen American "was, in fact, in possession of various documents it claims were never previously disclosed, because Defendant objected to providing, or reserved its right to supplement or amend its responses to Plaintiff's [discovery requests], because the alleged untimeliness of Defendant's discovery responses and supplementations is harmless, and because the Court can re-open discovery to prevent any alleged harmful or prejudicial effect on Plaintiff[.] Defendant's Response in Opposition to Motion to Strike (ECF 72), p. 1. Interstate argues that some of these challenged items were previously disclosed to Aspen American during litigation between the parties in Illinois state court–litigation that preceded this case–and so Aspen American's contention that the items were not previously disclosed is disingenuous. *Id*., p. 2. Interstate also argues that the challenged discovery responses are timely because "Rule 26(e) requires a party to timely supplement its initial disclosures and discovery responses when it

learns of new information or information that renders an earlier response inaccurate[]" and that such supplementation can be provided even after the close of formal discovery. *Id.*, p. 4. Finally, Interstate argues that the recently disclosed discovery items contain nothing new, and merely reiterate or repeat information already in the record. (For example, Interstate notes that the Tippmann letter simply repeats the information already contained in "the report of Plaintiff's own expert, James Goes, which contains an outline of Mr. Goes's visits to the subject warehouse facility." *Id.*, pp. 4-5.)

This skirmish is much ado about very little. The discovery materials that Aspen American challenges are, in the Court's assessment, rather innocuous. But more importantly, the Court did not consider or rely on any of the items in reaching its conclusions on the motion for sanctions. In that regard, the motion to strike is moot. If Aspen American believes that the challenged items should be deemed inadmissible at trial, it can renew its objections to them in a motion in limine at the appropriate time. At this juncture, however, the motion to strike is denied.

## CONCLUSION

For the reasons set forth above, the Motion for Sanctions (ECF 64) is GRANTED in part (as to the issue of spoliation of evidence) and DENIED in part (as to the applicable sanction to be imposed), and the Motion to Strike (ECF 70) is DENIED.

Date: December 5, 2019.

      /s/   William C. Lee
      William C. Lee, Judge
      U.S. District Court
      Northern District of Indiana